No. 94-3845

Mark Juan Hamilton;                    *
                                       *
          Appellee,                    *
                                       *
United States of America,              *
                                       *
          Intervenor,                  *
                                       *
     v.                                *
                                       *
Dora Schriro; Paul Delo;               *   Appeal from the United States
Jody Jackson; Bill Armontrout,         *   District Court for the Western
                                       *   District of Missouri.
          Appellants,                  *
                                       *
----------------------                 *
                                       *
Coalition for the Free Exercise        *
of Religion; Koinonia House of         *
Dupage County and Justice              *
Fellowship,                            *
                                       *
          Amicus Curiae.               *

_____

Submitted:  September 13, 1995

Filed:  January 12, 1996
_____

Before McMILLIAN, BEAM, and HANSEN, Circuit Judges.
_____

BEAM, Circuit Judge.


     Mark Juan Hamilton, an American Indian, initiated the present
action under the Civil Rights Act of 1871, 42 U.S.C. § 1983,
alleging that Missouri prison officials (prison officials) violated
his First Amendment right to free exercise of religion by requiring
him to cut his hair and by denying him access to a sweat lodge.
Applying the Religious Freedom Restoration Act (RFRA), 42 U.S.C. §
2000bb, the district court enjoined prison officials from enforcing

a hair length regulation and ordered them to provide a weekly sweat lodge ceremony. Prison officials appeal. Because the prison regulation and policy at issue do not violate Hamilton's right to free exercise of religion as protected by the First Amendment and RFRA, we reverse.

## I. BACKGROUND

Hamilton is incarcerated at the maximum security Potosi Correctional Center (Potosi).[1] The facility provides cross-denominational religious facilities inside prison buildings. American Indian inmates at Potosi are allowed to pray, to gather together for regularly scheduled services, to meet with outside spiritual leaders, and to obtain religious reading material from the library. American Indians are also allowed to carry medicine bags containing ceremonial items and have access to a ceremonial pipe and kinnikinnik (a ceremonial "tobacco" consisting of willow, sweet grass, sage and cedar). Potosi does not allow a sweat lodge, sweat lodge ceremony, or fires on the premises. Potosi officials enforce a Missouri Department of Corrections regulation that prohibits hair length beyond the collar for male inmates. Hamilton asserts that prison officials violated his First Amendment right to free exercise of religion by denying him and other American Indian prisoners access to a sweat lodge and by requiring their compliance with the hair length regulation.

Hamilton brought the present action seeking injunctive relief, damages and attorney fees. Hamilton's damage claims were dismissed and are not before us on appeal. A hearing was held on March 29 and 30, 1994, on Hamilton's equitable demands.

---

[1]Hamilton was incarcerated at the Jefferson City prison when he initiated this action. Hamilton was subsequently transferred to Potosi, where he was incarcerated at the time of the hearing in 1994.

## A. Hair Length

Hamilton testified that American Indian males believe that their hair is a gift from the Creator and is to be cut only when someone close to them dies. Hamilton and other American Indian inmates had long hair but were forced to cut it at the Potosi prison. Hamilton testified that at one time his hair was four-feet long.

Prison officials testified that long hair poses a threat to prison safety and security. Stephen Long, the Assistant Director of Adult Institutions for the Missouri Department of Corrections, testified that inmates could conceal contraband, including dangerous materials, in their long hair. Long stated that without the hair length regulation, prison staff would be required to perform more frequent searches of inmates, which could cause conflicts between staff and inmates. Searching an inmate's long hair would be difficult, especially if the inmate's long hair were braided. Long also testified that the prison had tried to control gangs by not allowing them to identify themselves through colors, clothes, or hair carvings. He testified that exempting American Indians from the hair length regulation could cause resentment by the other inmates. He concluded that there was no alternative to the hair length policy because only short hair can easily be searched and remain free of contraband. Finally, Long noted that long hair could also cause problems with inmate identification.

## B. Sweat Lodge

The sweat lodge ceremony primarily takes place inside a dome-shaped structure constructed of bent willow poles and covered with hides, blankets, or tarps. Rocks heated in a separate fire are placed in the center of the lodge. During the ceremony, several tools are used including an axe (to split the firewood), a shovel (to transfer the hot rocks from the fire to the sweat lodge) and

deer antlers.  Participants, who are nude, pour water on the hot rocks to create steam, which causes them to sweat.  Throughout the ceremony, the lodge remains covered to retain the steam and to keep out the light.  The ceremony lasts between one and three hours. When the lodge is not in use, the covers are removed but the willow poles remain intact.

Hamilton testified that the sweat lodge ceremony is instrumental to the practice of his religion because it purifies the participant.  Purity, according to Hamilton, is a prerequisite to participating in other religious ceremonies, such as offering prayers and smoking the sacred pipe.  Hamilton also testified that participants in these ceremonies must be seated outdoors on the ground.  Hamilton stated that if he could not have access to a sweat lodge ceremony, he would not and could not practice any aspect of his religion.

Hamilton introduced deposition testimony from prison administrators in a few other states that their respective facilities conduct sweat lodge ceremonies without any major problems.  These prison administrators conceded that they were aware of some problems, including rumors of sexual impropriety during the sweat lodge ceremony.  No prisoner had filed a formal complaint and the prison guards were unable to observe what actually occurred inside the lodge.

The Potosi prison officials testified that the sweat lodge requested by Hamilton raised concerns of prison safety and security.  Specifically, Long testified that the implements requested by Hamilton to conduct the sweat lodge ceremony, such as a shovel and an axe, could be used to assault other inmates and prison guards.  Long further testified that problems arise when inmates in a maximum security prison, who are typically prone to violence, congregate in groups.

-4-

Alan Luebbers, the Associate Superintendent at Potosi, testified that inmates who work with tools are supervised by prison guards. The secluded nature of the sweat lodge would make such supervision impossible, thus providing the inmates with an opportunity to assault other inmates, make weapons, use drugs, dig a tunnel, and engage in homosexual activity. Normally, a prison guard is posted at religious functions to observe the inmates and ensure their safety.

Gary Tune, the Chaplain at the Potosi Correctional Center, testified that if a sweat lodge were built it would be the only facility devoted to a single religion. Assistant Director Long also expressed concern over allowing Hamilton, an inmate, to decide who may or may not use the sweat lodge. He concluded that providing a sweat lodge may cause resentment among the inmates.

Jodie Jackson, the Chaplaincy Coordinator for the Missouri Department of Corrections, testified that some American Indian inmates at other Missouri state prisons practiced their religion outdoors on the ground without the benefit of a sweat lodge. Those prisoners offered prayers, observed special seasons, and smoked the ceremonial pipe. Jackson testified that Hamilton had not requested permission to practice his religion outdoors in a manner similar to that at other institutions. Jackson stated, however, that the Missouri Department of Corrections would consider such a request if it were made.

The district court found "that the regulations and policies at issue in this lawsuit with regard to plaintiff's practice of his . . . religion substantially [burden] plaintiff's exercise of his religion." Hamilton v. Schriro, 863 F. Supp. 1019, 1024 (W.D. Mo. 1994). The district court held that "[a]lthough safety, security and cost concerns may be shown to be compelling governmental interests in the prison setting, defendants have not shown that the regulations and practices used by the Missouri Department of

Corrections are the least restrictive means of furthering that interest." Id. The district court enjoined enforcement of the hair length regulation and ordered the prison officials to allow Hamilton to practice his religion, including a weekly sweat lodge ceremony. Id. at 1020. In a subsequent order, the district court awarded attorney fees to Hamilton. The district court also stated "that for 6 months after the sweat lodge becomes operational and the ceremony is implemented, participation in the sweat lodge ceremony shall be limited to those who are sincere adherents of the Native American religion or to those who have been approved for participation by majority vote of Native Americans who practice the Native American religion and are scheduled to participate in the ceremony." Hamilton v. Schriro, No. 91-4373, Amended Judgment (W.D. Mo. Nov. 21, 1994).

On appeal, the prison officials contend that: (1) Hamilton is not sincere in his adherence to the American Indian religion; (2) the prison regulations and policies do not substantially burden Hamilton's free exercise of his religious beliefs; and (3) the limitations imposed on hair length and sweat lodges are the least restrictive means of furthering the compelling interest of maintaining prison safety and security. The prison officials also assert that under any circumstances, the condition imposed by the district court on who may participate in the sweat lodge ceremony is unprecedented and unreasonable.

II. DISCUSSION

As with any section 1983 action, we must determine: (1) whether the conduct complained of was committed by a person acting under color of state law; and (2) whether this conduct deprived a person of a right, privilege, or immunity secured by the Constitution or laws of the United States. 42 U.S.C. § 1983; Thomas v. Gunter, 32 F.3d 1258, 1259 (8th Cir. 1994). Because the prison officials were acting under color of state law, the first

-6-

requirement of this two-part test is satisfied.  Gunter, 32 F.3d at 1259.

Turning to the second requirement, Hamilton's section 1983 action was originally based on the claim that the prison officials deprived him of his First Amendment right to the free exercise of his religion.[3]  After this action was initiated, however, Congress enacted the Religious Freedom Restoration Act of 1993 (RFRA), 42 U.S.C. § 2000bb.  RFRA applies retroactively.  See Brown-El v. Harris, 26 F.3d 68, 69 (8th Cir. 1994).  Therefore, Hamilton's section 1983 action now encompasses two separate theories:  (1) deprivation of his constitutionally protected First Amendment right to the free exercise of his religion; and (2) deprivation of his statutorily protected right, under RFRA, to the free exercise of his religion.  See generally Goodall v. Stafford County Sch. Bd., 60 F.3d 168, 170 (4th Cir.), cert. denied, 64 U.S.L.W. 3333 (Jan. 8, 1996) (No. 95-666).[4]  We hold that Hamilton has failed to establish a deprivation under either his constitutional or statutory right to free exercise of religion.[5]  Because we hold that Hamilton's section 1983 action fails under either

---

[3]The First Amendment provides in pertinent part:  "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; . . . ."  U.S. Const. amend. I.

[4]Some courts and commentators apparently interpret RFRA as legislatively creating a compelling interest test that is to be applied in all free exercise cases, thereby completely supplanting prior constitutional standards.  Even if Congress has the authority to mandate such an approach, Hamilton's claim would fail under the test set out in RFRA.  See infra Part II.B.

[5]Although the district court resolved the present case only under RFRA, we think it is necessary to address the constitutional claim because the district court suggested that it would have found for Hamilton even under the constitutional analysis.  Hamilton, 863 F. Supp. at 1022.

-7-

constitutional or RFRA analysis, we need not and do not consider the constitutionality of RFRA.[6]

## A. Constitutional Analysis

Prison inmates "do not forfeit all constitutional protections by reason of their conviction and confinement in prison." Bell v. Wolfish, 441 U.S. 520, 545 (1979). Moreover, "federal courts must take cognizance of the valid constitutional claims of prison inmates," Turner v. Safley, 482 U.S. 78, 84 (1987), which include actions based on free exercise rights protected by the First Amendment. See Pell v. Procunier, 417 U.S. 817, 822 (1974).

However, "`[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system.'" Jones v. North Carolina Prisoners' Labor Union, Inc., 433 U.S. 119, 125 (1977) (quoting Price v. Johnston, 334 U.S. 266, 285 (1948)). "The fact of confinement and the needs of the penal institution impose limitations on constitutional rights, including those derived from the First Amendment, which are implicit in incarceration." Jones, 433 U.S. at 125. Furthermore, "`issues of prison management are, both by reason of separation of powers and highly practical considerations of judicial competence, peculiarly ill-suited to judicial resolution, and . . . accordingly, courts should be loath to substitute their judgment for that of prison

---

[6]See, e.g., United States v. Congress of Indus. Org., 335 U.S. 106, 125 (1948) (Frankfurter, J., concurring) ("`No questions can be brought before a judicial tribunal of greater delicacy than those which involve the constitutionality of a legislative act. . . . [I]f the case may be determined on other points, a just respect for the legislature requires, that the obligation of its laws should not be unnecessarily and wantonly assailed.' Ex parte Randolph, 20 Fed. Cas. No. 11,558 at 254, 2 Brock. 447, 478-79 (C.C.D. Va. 1833)."). Moreover, if RFRA were held to be unconstitutional in the future, that determination would not affect the validity of our holding in the present case.

officials and administrators.'"  Iron Eyes v. Henry, 907 F.2d 810, 812 (8th Cir. 1990) (quoting Pitts v. Thornburgh, 866 F.2d 1450, 1453 (D.C. Cir. 1989)).

An inmate who challenges the constitutionality of a prison regulation or policy that limits the practice of religion must first establish that it infringes upon a sincerely held religious belief.  Hill v. Blackwell, 774 F.2d 338, 342-43, (8th Cir. 1985).  In the present case, we assume that Hamilton's religious beliefs are sincerely held.  See Iron Eyes, 907 F.2d at 813 (determining the sincerity of a person's religious belief "is factual in nature and thus is subject to the clearly erroneous standard of review").

A prisoner's free exercise claim is "judged under a `reasonableness' test less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights." O'Lone v. Estate of Shabazz, 482 U.S. 342, 349 (1987); see also Turner, 482 U.S. at 87-91.  In Turner, the Supreme Court articulated the applicable constitutional test in the context of prison regulations: "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests."  482 U.S. at 89. Prison security is one of these penological interests.  O'Lone, 482 U.S. at 348.  Several factors are to be considered when evaluating the reasonableness of a prison regulation:  (1) whether there is a valid, rational connection between the regulation and the asserted governmental interest; (2) whether alternative means for exercising the right remain open to the prisoner; (3) the impact of the regulation on prison staff, other inmates, and the allocation of prison resources; and (4) the availability of ready alternatives to the regulation.  Turner, 482 U.S. at 89-91.

### 1. Hair Length Regulation

We have previously applied the <u>Turner</u> factors to an American Indian prisoner's claim that hair length regulations violated his constitutionally guaranteed right to free exercise of religion and concluded that such a regulation passes constitutional muster. <u>Iron Eyes</u>, 907 F.2d at 813-16. Our prior decisions make it abundantly clear that Hamilton's constitutional challenge to the prison hair length regulation must fail. <u>Id.</u>; <u>see also</u> <u>Sours v. Long</u>, 978 F.2d 1086 (8th Cir. 1992) (per curiam); <u>Kemp v. Moore</u>, 946 F.2d 588 (8th Cir. 1991) (per curiam), <u>cert. denied</u>, 504 U.S. 917 (1992). Therefore, we conclude that under the <u>Turner</u> criteria, Hamilton's free exercise right is outweighed by the validity of the regulation. <u>See</u> <u>Iron Eyes</u>, 907 F.2d at 816.

### 2. Sweat Lodge

As with prison hair length regulations, we have previously resolved the issue of whether a prison official's denial of access to a sweat lodge violates an American Indian inmate's free exercise right under the First Amendment. <u>Kemp</u>, 946 F.2d 588 (affirming the district court's decision denying a prisoner's request for an order to require the construction of a sweat lodge). In a recent case, however, we acknowledged that such a determination "depends upon whether the restriction imposed by prison authorities bears a rational relationship to the furtherance of a legitimate penological interest." <u>Thomas v. Gunter</u>, 32 F.3d 1258, 1260 (8th Cir. 1994) (concluding that the district court improperly granted summary judgment for prison authorities because their justification for denying the inmate sweat lodge access was based on "security-related limitations," which did not provide a sufficiently specific basis to determine if some rational relationship existed between the denial of access and security). Applying the <u>Turner</u> factors to the present case, we conclude that the prison officials' denial of

Hamilton's access to a sweat lodge was rationally related to the legitimate penological interests of safety and security at Potosi.

First, prohibiting Hamilton and other inmates from meeting in a completely enclosed area is rationally connected to preventing the type of harm prison officials fear would occur in the sweat lodge. Second, alternative means remain open to Hamilton for exercising his religion, including carrying a medicine bag containing ceremonial items, having access to a ceremonial pipe and kinnikinnik, and praying with other American Indian inmates. Third, accommodating Hamilton's request for a sweat lodge would have an adverse impact on prison staff, other inmates, and prison resources due to the risk of assaulting participants in the ceremony, as well as possible resentment resulting from the erection of an exclusive religious facility. Finally, Hamilton has failed to "point to an alternative that fully accommodates the prisoner's rights at de minimis cost to valid penological interests." Turner, 482 U.S. at 91.

Therefore, we hold that the constitutional claim underlying Hamilton's section 1983 action fails. Our prior decisions make it clear that enforcing prison hair length regulations, such as the one at issue in the present case, and prohibiting sweat lodge ceremonies do not violate an inmate's constitutional right to free exercise of religion. Additionally, the applicable constitutional analysis articulated by the Supreme Court in Turner supports our conclusion that the prison officials' failure to provide Hamilton with a sweat lodge does not violate his right to free exercise of religion.

**B. RFRA Analysis**

In 1993, Congress enacted RFRA, which statutorily created a compelling interest-least restrictive means test[7] to be applied to all cases where free exercise of religion is substantially burdened. 42 U.S.C. § 2000bb(b)(1). The stated purpose of enacting RFRA was "to restore the compelling interest test as set forth in <u>Sherbert v. Verner</u>, 374 U.S. 398 (1963) and <u>Wisconsin v. Yoder</u>, 406 U.S. 205 (1972) and to guarantee its application in all cases where free exercise of religion is substantially burdened." 42 U.S.C. § 2000bb(b)(1).[8] In addition, Congress intended "to

---

[7]The statute provides in relevant part:

(a) In general

Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability, except as provided in subsection (b) of this section.

(b) Exception

Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person--

(1) is in furtherance of a compelling governmental interest; and

(2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. 2000bb-1(a),(b).

[8]Congress enacted RFRA in response the Supreme Court's holding in <u>Employment Div., Dep't of Human Resources of Oregon v. Smith</u>, 494 U.S. 872, 886 n.3 (1990), that "generally applicable, religion-neutral laws that have the effect of burdening a particular religious practice need not be justified by a compelling governmental interest." 42 U.S.C. § 2000bb(a)(4) (finding that in <u>Smith</u>, "the Supreme Court virtually eliminated the requirement that the government justify burdens on religious exercise imposed by laws neutral toward religion").

restore traditional protection afforded to prisoners' claims prior to <u>O'Lone</u>."  S. Rep. No. 111, 103d Cong., 1st Sess. (1993), <u>reprinted in</u> 1993 U.S.C.C.A.N. 1892, 1899 (Senate Report).  <u>See also</u> 139 Cong. Rec. S14468 (daily ed. Oct. 27, 1993) (recording the Senate vote rejecting a proposed amendment that would have excluded prisoners' free exercise claims from the compelling interest standard in RFRA).  Congress intended for RFRA "to provide  a claim or defense to persons whose religious exercise is substantially burdened by government."  42 U.S.C. § 2000bb(b)(2).

For purposes of our analysis, we assume that the regulations and policies at issue in the present case substantially burden Hamilton's exercise of his religion.  <u>Hamilton</u>, 863 F. Supp. at 1024.  The district court acknowledged that "safety, security and cost concerns may be shown to be compelling governmental interests in the prison setting."  <u>Id.</u>  <u>See also</u> <u>Pell</u>, 417 U.S. at 823.  Under RFRA, the prison officials bear the burden of demonstrating that the regulation is the least restrictive means of achieving a compelling interest.  42 U.S.C. § 2000bb-1(b).  Therefore, the primary question before us is whether the district court erred in holding that the prison policies and regulations at issue were not the least restrictive means of achieving the compelling interest of prison safety and security.

The district court's conclusion that the prison officials failed to satisfy the statutorily imposed test under RFRA is a question of law which is subject to de novo review.  While the district court's findings of fact are subject to a clearly erroneous standard of review, the ultimate conclusion as to whether the regulation deprives Hamilton of his free exercise right is a question of law subject to de novo review.  <u>See</u> <u>Hill</u>, 774 F.2d at 343.  We find that applying the least restrictive means prong of RFRA also raises an issue of statutory construction, which is subject to de novo review.  <u>See generally</u> <u>Department of Social Serv. v. Bowen</u>, 804 F.2d 1035, 1037 (8th Cir. 1986).

-13-

Pre-O'Lone case law and RFRA's legislative history indicate that the applicable test must be construed in the prison setting, giving due deference to the expert judgment of prison administrators. See generally Abbott Cooper, Comment, Dam the RFRA at the Prison Gate:  The Religious Freedom Restoration Act's Impact on Correctional Litigation, 56 Mont. L. Rev. 325 (1995).  The legislative history of RFRA also shows that while Congress intended for the same compelling interest test in the statute to apply to prisoners as well as non-prisoners, the outcome of the analysis would depend upon the context.  It was noted in the Senate Report that:

> The Religious Freedom Restoration Act would establish one standard for testing claims of Government infringement on religious practices.  This single test, however, should be interpreted with regard to the relevant circumstances in each case.

Senate Report at 9, 1993 U.S.C.C.A.N. at 1898.  Thus, while Congress intended to revoke O'Lone, it did not intend to impose a more rigorous standard than the one that was applied prior to O'Lone.  Id.  Therefore, pre-O'Lone case law provides useful guidance on how to interpret the test in RFRA and how to resolve the present case.

The Supreme Court has long recognized the need to defer to the judgment of prison administrators when evaluating the validity of a prison regulation that impinges an inmate's First Amendment rights.  See, e.g., Procunier v. Martinez, 416 U.S. 396, 404-05 (1974).  In Martinez, the Court held, among other things, that a prison mail censorship regulation was invalid.  Id. at 415-16. Nevertheless, the Supreme Court noted:  "[C]ourts are ill equipped to deal with the increasingly urgent problems of prison administration and reform. . . . Moreover, where state penal institutions are involved, federal courts have a further reason for deference to the appropriate prison authorities."  Id. at 405.  In

-14-

<u>Jones</u>, 433 U.S. at 125, the Court upheld prison regulations that prohibited meetings of prisoners' labor unions, solicitations to join the union, and bulk mailings concerning the union from outside sources against a First Amendment challenge, noting that the lower court "got off on the wrong foot . . . by not giving appropriate deference to the decisions of prison administrators and appropriate recognition to the peculiar and restrictive circumstances of penal confinement."  In <u>Pell</u>, the Court rejected the inmates' First Amendment challenge to the ban on media interviews, noting that judgments regarding prison security "are peculiarly within the province and professional expertise of corrections officials, and, in the absence of <u>substantial</u> evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters."  417 U.S. at 827 (emphasis added); <u>see also</u> <u>Bell v. Wolfish</u>, 441 U.S. 520 (1979).  Therefore, even prior to the reasonableness test expressly set out in <u>O'Lone</u>, the Supreme Court afforded deference to the judgment of prison administrators when evaluating the validity of a prison regulation.  <u>See</u> <u>Thornburgh v. Abbott</u>, 490 U.S. 401, 411 (1989) (in adopting the reasonableness test set out in <u>Turner</u> and overruling <u>Martinez</u>, the Court stated:  "We do not believe that <u>Martinez</u> should, or need, be read as subjecting the decisions of prison officials to a strict `least restrictive means' test."); <u>Turner</u>, 482 U.S. at 87.[9]

We have applied the pre-<u>O'Lone</u> Supreme Court test in the context of a prisoner's First Amendment right to the free exercise of religion.  <u>See</u> <u>Hill</u>, 774 F.2d at 340-43; <u>Rogers v. Scurr</u>, 676 F.2d 1211, 1215 (8th Cir. 1982) ("[W]hen the maintenance of

_____

[9]Another circuit was also "persuaded . . . by the reasoning of <u>Wolfish</u>, <u>Pell</u>, and <u>Martinez</u> that [the pre-<u>O'Lone</u> test required] prisoner free exercise claims [to] be judged in accordance with a standard different from that applied outside the prison."  <u>Madyun v. Franzen</u>, 704 F.2d 954, 959 (7th Cir.), <u>cert. denied</u>, 464 U.S. 996 (1983).

institutional security is at issue, prison officials ordinarily must have wide latitude within which to make appropriate limitations."). Thus, prior to <u>O'Lone</u>, we applied a test that required balancing the need for a particular regulation and the invasion of religious freedom that the restriction caused. <u>Hill</u>, 774 F.2d at 342 (citing <u>Pell</u>, 417 U.S. at 822-23); <u>see also</u> <u>Murphy v. Missouri Dep't of Corrections</u>, 814 F.2d 1252, 1256 (8th Cir. 1987). The Senate Report shows that RFRA was intended to restore this balancing test:

> Prior to <u>O'Lone</u>, courts used a balancing test in cases where an inmate's free exercise rights were burdened by an institutional regulation; only regulations based upon penological concerns of the "highest order" could outweigh an inmate's claims.

Senate Report at 9-10, 1993 U.S.C.C.A.N. at 1899.[10] Prison safety and security are penological concerns of the highest order.

This balancing test mandates that limitations on free exercise rights "be no greater than necessary to protect the governmental interest involved[.]" <u>Scurr</u>, 676 F.2d at 1215 (citing <u>Procunier v. Martinez</u>, 416 U.S. 396, 413 (1974)). In the prison context, however, prison officials ordinarily must have wide latitude within which to make appropriate limitations to maintain institutional security. <u>Id.</u> This is because "central to all other corrections goals is the institutional consideration of internal security within the corrections facilities themselves." <u>Pell</u>, 417 U.S. at 823.

---

[10]Although there were several versions of the applicable test prior to <u>O'Lone</u>, <u>see generally</u> Mary A. Schnabel, Comment, <u>The Religious Freedom Restoration Act:  A Prison's Dilemma</u>, 29 Willamette L. Rev. 323 (1993), we look to Supreme Court precedent, RFRA's legislative history, and our own case law for guidance.

We find the "no greater than necessary" requirement to be functionally synonymous with the "least restrictive means" prong of the RFRA test when applied in the prison context. Because we are faced with a prison case where the maintenance of institutional security is at issue, we must give the prison officials wide latitude within which to make appropriate limitations.

Our interpretation and application of the least restrictive means prong of the RFRA test is consistent with the statute's legislative history. Significantly, the legislative history of RFRA recognizes the necessity for courts to continue deferring to the judgment of prison officials.

> The committee [on the Judiciary] does not intend the act [RFRA] to impose a standard that would exacerbate the difficult and complex challenges of operating the Nation's prisons and jails in a safe and secure manner. Accordingly, the committee expects that the courts will continue the tradition of giving due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources.

Senate Report at 10, 1993 U.S.C.C.A.N. at 1899-1900 (footnote omitted). In fact, the Senate rejected a proposed amendment that would have excluded prisoners from the scope of RFRA, finding that such an express exclusion was not necessary because courts had been extremely deferential to prison authorities. See 139 Cong. Rec. S14467 (daily ed. Oct. 27, 1993). Senator Danforth concluded that "RFRA mandates a uniform test, not a uniform result." Id.

Therefore, both pre-O'Lone Supreme Court case law and the relevant legislative history indicate that a court applying RFRA must give due deference to the expertise of prison officials in establishing regulations to maintain prison safety and security,

-17-

even when the court applies a "heightened" standard of review.[11] We hold that the prison officials in the present case demonstrated that the prison regulation and policy at issue are the least restrictive means of maintaining the prison's compelling interest in institutional safety and security.

### 1. Hair Length Regulation

As earlier noted, prison officials testified that prison security requires them to prevent inmates from concealing contraband in their long hair and identifying with a particular gang. The prison officials also testified that preventing male inmates from growing their hair longer than collar length is the least restrictive way to achieve that goal because no viable alternatives exist.

Our prior case law supports the conclusion that the prison officials may enforce a hair length regulation such as the one at issue in the present case. Cf. Iron Eyes, 907 F.2d at 815-16 (applying the reasonableness test set out in O'Lone to a prison hair length regulation we concluded that "[a]ny other solution would come at more than a de minimis cost to valid penological interests").[12] In an analogous situation, we held, under the pre-

_____

[11]Of course, this is not to say that a reviewing court must accept the justification articulated by prison authorities in all cases. In order to satisfy their burden under RFRA, prison authorities must do more than offer conclusory statements and post hoc rationalizations for their conduct. Senate Report at 10, 1993 U.S.C.C.A.N. at 1900.

[12]Hamilton argues that our prior decision in Teterud v. Burns, 522 F.2d 357 (8th Cir. 1975) is dispositive of the hair length regulation. Hamilton's reliance on Teterud is misplaced. In Teterud, we noted that "the only reason advanced in support of the regulation was the Warden's opinion, unsupported by empirical proof, that the hair net and reidentification requirements necessitated by allowing long hair would create a `hassle' between correction officers and inmates." Id. at 361; see also Hill, 774 F.2d at 341-42 (distinguishing Teterud on the basis that "the

-18-

O'Lone standard, that prison officials could prohibit Muslim inmates from wearing religious caps and robes outside prayer meetings because such attire made it too easy to conceal contraband. Scurr, 676 F.2d at 1215. We stated that the prison authorities' explanation was "eminently reasonable, particularly in view of the fact that operating personnel is limited." Id.

It is more than merely "eminently reasonable" for a maximum security prison to prohibit inmates from having long hair in which they could conceal contraband and weapons. It is compelling. Further, it is important for prison administrators to prevent inmates from identifying with particular gangs through their hair style. The safety and security concerns expressed by prison officials were based on their collective experience of administering correctional facilities. These are valid and weighty concerns. Moreover, there is no viable less restrictive means of addressing these concerns.[13] Therefore, we conclude that the

_____

[W]arden's justification for the regulation was not founded on a legitimate concern for prison security, and there was no need to decide whether the prison officials had exaggerated their response to a legitimate security consideration"). In the present case, the hair length regulation was founded on the legitimate concern that prison safety would be compromised by inmates concealing contraband in their long hair or identifying with a particular gang.

   [13]Although no other circuit has yet decided whether RFRA precludes prison hair length regulations, several district courts have upheld such regulations against RFRA challenges. Phipps v. Parker, 879 F. Supp. 734, 736 (W.D. Ky. 1995) (holding that "cutting inmates' hair short appears to be the only plausible way to meet these safety concerns, and thus satisfies the requirement that the least restrictive means available be used to achieve the compelling interests"); Diaz v. Collins, 872 F. Supp. 353, 359 (E.D. Tex. 1994) ("The potential of hiding contraband in long hair cannot be vitiated except through a regulation that hair be kept short."). In Phipps, the district court recognized that "[w]hile other methods might be used, such as constantly searching inmates for contraband, such means would be impractical and just as likely to burden constitutional interests." 879 F. Supp. at 736. These cases support our conclusion that the district court in the present case failed to give due deference to the expert judgment of prison officials who testified that no viable alternative existed to the

-19-

district court erred in its interpretation and application of the least restrictive means prong of the compelling interest test in RFRA. The district court failed to give due deference to the prison officials' testimony that long hair presented a risk to prison safety and security and that no viable less restrictive means of achieving that goal existed.

### 2. Sweat Lodge

The prison officials asserted that to maintain prison security they must prevent inmates from assaulting each other, escaping, using drugs, and engaging in homosexual conduct. The prison officials testified that a traditional American Indian sweat lodge would provide inmates with an opportunity to engage in these activities without being seen by prison guards. Moreover, the prison officials testified that providing specific inmates with their own exclusive religious facility would appear to other inmates as an act of favoritism and would lead to resentment. According to prison officials, prohibition of the sweat lodge ceremony is the least restrictive means of ensuring prison safety and security because Hamilton has refused to consider any type of modified ceremony where participants would be allowed to pray outside on the ground without the opaque covering.[14]

---

hair length regulation.

[14]To date, no circuit has decided whether RFRA protects an American Indian's free exercise right to the extent that a prison must provide a sweat lodge. In Werner v. McCotter, 49 F.3d 1476, 1480 (10th Cir. 1995), cert. denied, 115 S. Ct. 2625 (1995), the court acknowledged that an American Indian prisoner had made out a prima facie case under RFRA, but remanded the case to the district court because the record was almost devoid of the facts necessary to allow the court to balance the governmental interest at stake against the restrictions placed on the inmate.

Although RFRA places the burden of production and persuasion on the prison officials,[15] once the government provides this evidence, the prisoner must demonstrate what, if any, less restrictive means remain unexplored. It would be a herculean burden to require prison administrators to refute every conceivable option in order to satisfy the least restrictive means prong of RFRA. Moreover, such an onerous requirement would be irreconcilable with the well-established principle, recognized by the Supreme Court and RFRA's legislative history, that prison administrators must be accorded due deference in creating regulations and policies directed at the maintenance of prison safety and security. See O'Lone, 482 U.S. at 350.

Prison officials testified that they would consider a proposal to allow American Indian inmates to meet outdoors on the ground to pray and conduct the pipe ceremony. According to prison officials, American Indian inmates at other Missouri prisons are allowed to participate in various ceremonies outdoors on the ground without a sweat lodge. This type of modified ceremony would eliminate a primary concern of prison officials, namely the inability of prison guards to observe the inmates in the lodge. Hamilton testified, however, that he would not and could not practice his religion in any capacity if he were not allowed to participate in a sweat lodge ceremony.

This case presents the unusual situation where the government has satisfied the least restrictive means prong by demonstrating that other less restrictive alternatives are not acceptable to the plaintiff. See Cheema v. Thompson, 67 F.3d 883, 894 (9th Cir. 1995) (Wiggins, J., dissenting) (noting that the case presented a unique question of least restrictive means analysis because the

_____

[15]"As used in [RFRA] . . . the term `demonstrates' means meets the burdens of going forward with the evidence and of persuasion[.]" 42 U.S.C. § 2000bb-2(3).

-21-

plaintiffs have taken an all-or-nothing position).  Hamilton's own all-or-nothing position supports the prison officials' contention that an outright prohibition against a sweat lodge ceremony is the least restrictive means of achieving the compelling interests of prison safety and security in this case.

Hamilton testified that the sweat lodge ceremony could probably be conducted without the axe.  Hamilton also "invited" prison guards to participate in the sweat lodge ceremony with the prisoners.  Neither of Hamilton's suggestions, however, adequately addresses the prison officials' concerns.  First, the axe is only one of several potentially dangerous instruments used in the sweat lodge ceremony.  Thus, conducting the sweat lodge ceremony without the axe would not obviate the risk that the other instruments (e.g., deer antlers) would be used as a weapon.  Second, the physical characteristics of the sweat lodge (i.e., low doorway and no light) would create a serious risk to prison guards searching the lodge during a ceremony.  Thus, the prison officials' concern that the participants could engage in prohibited conduct while inside the opaque lodge are not alleviated.

There may very well be less restrictive means of achieving prison safety and security than completely prohibiting sweat lodge ceremonies.  Justice Blackmun recognized the dilemma implicit in a least restrictive means analysis: "A judge would be unimaginative indeed if he could not come up with something a little less `drastic' or a little less `restrictive' in almost any situation, and thereby enable himself to vote to strike legislation down." Illinois State Bd. of Elections v. Socialist Workers Party, 440 U.S. 173, 188-89 (1979) (Blackmun, J., concurring).  Hamilton has failed to enlighten us as to any viable less restrictive means that may remain available to the prison officials short of prohibiting

the sweat lodge ceremony entirely.  Accordingly, we hold that the prison officials have satisfied their burden under RFRA.[16]

### III. CONCLUSION

In sum, we hold that the district court failed to give due deference to prison officials who testified as to the necessity of the prison hair length regulation and prohibition against a sweat lodge to maintain prison safety and security.  Because the least restrictive means prong of the compelling interest test in RFRA requires no more than the pre-O'Lone cases required, the prison officials' justifications for the hair length regulation and prohibition of a sweat lodge ceremony were sufficient.  On these facts we conclude that the prison regulations at issue do not

---

[16]A remand to the district court is not necessary in this case because the record contains sufficient factual support for our conclusion that the prison officials have satisfied their burden under RFRA.  We recognize that additional evidence was placed in the record as part of Hamilton's post-judgment motion to preserve the status quo.  However, we rely only on the evidence that was before the district court to reach our conclusion.

The district court relied on the deposition testimony of prison administrators from a few other states that they were conducting sweat lodge ceremonies without the problems envisioned by the Missouri prison officials.  See Hamilton, 863 F. Supp. at 1023.  This deposition testimony, however, also revealed that the prison administrators were aware of various problems with the sweat lodges, including allegations of sexual improprieties occurring in the lodges.  Prison administrators stated that no formal charges had been filed due to the reluctance of prisoners to testify and the fact that no prison guard could observe the participants while they were in the lodge.

The district court acknowledged that "Missouri corrections personnel relied on their experience in corrections work and on a belief that such practices would interfere with the safety and security of the institution."  Id.  Although prison policies from other jurisdictions provide some evidence as to the feasibility of implementing a less restrictive means of achieving prison safety and security, it does not outweigh the deference owed to the expert judgment of prison officials who are infinitely more familiar with their own institutions than outside observers.

violate Hamilton's right to the free exercise of religion as protected by the Constitution and RFRA. Our decision does not, however, foreclose the possibility of a successful sweat lodge claim under different circumstances. Furthermore, we encourage prisons to accommodate the religious needs of inmates, including American Indian inmates, by providing facilities beyond the bare minimum. Accordingly, the district court's decision and award of attorney fees is reversed. All pending motions before this court are overruled.

McMILLIAN, Circuit Judge, dissenting.

I respectfully dissent from Part II(B)(1) of the majority opinion insofar as it holds that Tetrud v. Burns, 522 F.2d 357 (8th Cir. 1975) (Tetrud), is not dispositive of the hair length regulation issue under the compelling interest test. See slip op. at 18 n.12. Accordingly, if I were of the opinion that the Religious Freedom Restoration Act (RFRA) is constitutional, then I would affirm the district court's holding that the hair length regulation violates federal law. However, for the reasons discussed below, I believe that RFRA is unconstitutional. Therefore, I would vacate the judgment of the district court and remand the case for further proceedings.

I.

Hamilton is an inmate at the Potosi Correctional Center (Potosi), a maximum security facility of the Missouri Department of Corrections. He filed this civil rights lawsuit after unsuccessfully pursuing prison grievance procedures. He claims that prison officials (hereinafter defendants) violated his First Amendment right to freely exercise his Native American religion. Hamilton, whose mother was of Choctaw descent, primarily contended that a prison grooming regulation prevented him from growing long

hair and that defendants denied his request to build a sweat lodge in which to conduct religious ceremonies.

At the two-day evidentiary hearing held before the magistrate judge in March 1994, Hamilton submitted the deposition testimony of a number of prison officials from states other than Missouri. These officials testified as to their experience with sweat lodges and hair length regulation at their respective facilities. An assistant superintendent from a facility in Springfield, South Dakota, testified that they have had a sweat lodge since 1985 and that there have been no security problems or claims of sexual misconduct. Prison officials from Wisconsin and Iowa gave similar testimony as to their facilities' experience with sweat lodges. With regard to hair length, prison officials from Iowa and South Dakota testified that their states' penitentiaries have abandoned hair length regulation. Hamilton also submitted the deposition testimony of Chief Mato Wanagi Baldwin of the Menicongulakota Tribe. Chief Baldwin testified about the religious significance of the sweat lodge ceremony and the growing of long hair. His testimony corroborated Hamilton's claim that a sweat lodge ceremony must be outside on the ground and that Native Americans traditionally wear their hair long and braided.

Following the evidentiary hearing, the magistrate judge issued a written report and recommendation. Hamilton v. Schriro, No. 91-373-CV-C-5 (W.D. Mo. Apr. 13, 1994) (Report and Recommendation). In his evaluation of Hamilton's claims, the magistrate judge expressly relied on RFRA, 42 U.S.C. § 2000bb-bb4, which had become effective in November 1993, a few months before the hearing on Hamilton's equitable claims. The magistrate judge specifically found that Hamilton's religious beliefs were sincerely held and that the sweat lodge ceremony was an "essential component" of his Native American religion. Report and Recommendation at 4. The magistrate judge found defendants' denial of Hamilton's requests unreasonable because they did not

(1) make any inquiry of problems encountered by personnel at institutions which allow the practice of Native American religions; (2) contact any Native American religious leader to determine the feasibility of [Hamilton's] requests, or to determine whether other acceptable alternatives existed; or (3) do a cost analysis or make inquiry regarding the availability of funds or the amount of funds that would be required.

Id. at 5. In essence, the magistrate judge concluded that defendants "made absolutely no effort to determine whether the religious practices could be accommodated while still taking care of safety and security concerns." Id. The magistrate judge also found that the concerns about the smuggling of contraband and inmate identification with regard to hair length were overstated. Id. at 6. Accordingly, the magistrate judge recommended that defendants be enjoined from enforcing hair length regulations against Hamilton and that "accommodations be made in accordance with the Religious Freedom Restoration Act to allow [Hamilton] to practice his Native American religion, including the right to have a weekly sweat lodge ceremony." Id. at 7.

The district court adopted the recommendation but modified it to require the parties to seek a compromise on the precise way to effectuate the remedy with regard to the sweat lodge ceremonies. Hamilton v. Schriro, 863 F. Supp. 1019 (W.D. Mo. 1994) (publishing the full text of the magistrate judge's report and recommendation). However, the parties were unable to resolve all of the issues. The parties could not agree on the location of the sweat lodge, and defendants wanted the sweat lodge to be available to all inmates, in accordance with their policy toward other religious services. The case was thus referred back to the magistrate judge who recommended a possible location for the sweat lodge and also recommended that

for six (6) months after the sweat lodge becomes operational and the ceremony is implemented, participation in the sweat lodge ceremony be limited to

-26-

those who are sincere adherents of the Native American religion or to those who have been approved for participation by majority vote of Native Americans who practice the Native American religion and are scheduled to participate in the ceremony.

Slip op. at 2 (Sept. 8, 1994) (Report and Recommendation II). The district court adopted the recommendation on eligibility for participation in the sweat lodge ceremony verbatim and the other recommendations with only minor modifications. Id. (Oct. 21, 1994).

## II.

Our court first heard oral argument in this case in May 1995. At that time, defendants did not challenge the constitutionality of RFRA. However, because of some concern over the district court's treatment of the issue, we asked the parties to submit supplemental briefs. Defendants, in their supplemental brief, have argued that RFRA is unconstitutional. Shortly after the oral argument, the United States (the government) moved to intervene as plaintiff-intervenor and also requested supplemental oral argument. We granted the government's motion to intervene and heard supplemental argument from the parties in September 1995.

## A.

As a threshold matter, I discuss my reasons for reaching the constitutionality of RFRA. Although neither party initially raised the constitutional issue on appeal, defendants did raise the issue before the magistrate judge. In the report and recommendation concluding that Hamilton was entitled to injunctive relief, the magistrate judge discussed the constitutionality of RFRA as follows:

The court is cognizant of defendants' suggestion . . . that the constitutionality of RFRA has not yet been

-27-

> determined. Section 5 of the fourteenth amendment encompasses the liberties guaranteed by the first amendment. [citation omitted] It follows, therefore, that Congress may enact laws enforcing the provisions of the first amendment. In the absence of compelling arguments or case law indicating otherwise, this court will not further address this issue.

Report and Recommendation at 7. The district court's order adopting the Report and Recommendation did not address the constitutional question. Although brief, the magistrate judge's treatment of the issue clearly reaches the conclusion that § 5 of the Fourteenth Amendment provides Congress with a constitutional basis for the enactment of RFRA.

Although it appears the issue of RFRA's constitutionality received limited consideration in the district court, we have previously held that "[i]t is not unfair to a trial court for an appellate court to decide a question that the trial court actually reached in its opinion, notwithstanding the fact that it was not argued by the parties." Struempler v. Bowen, 822 F.2d 40, 42 (8th Cir. 1987). Moreover, even where the district court has not considered an issue, "[t]he matter of what questions may be taken up and resolved for the first time on appeal is one left primarily to the discretion of the courts of appeals, to be exercised on the facts of individual cases." Singleton v. Wulff, 428 U.S. 106, 121 (1976). In the present case, the factual record has been fully developed, and the magistrate judge, although admittedly in passing, expressly upheld the constitutionality of RFRA. Under these circumstances, I would not refrain from consideration of the constitutional issue.

B.

Long-standing principles teach us to be reluctant to consider the constitutionality of a federal statute. See Zobrest v. Catalina School Dist., 113 S. Ct. 2462, 2465-66 (1993). It is

-28-

well-settled that an act of Congress is to be presumed constitutional and that doubts about the construction of a federal statute are to be resolved, if fairly possible, in favor of its constitutionality. Id. With these principles of statutory construction in mind, I note that the district court concluded that Hamilton was entitled to equitable relief because defendants failed to satisfy their burden of demonstrating that their infringement upon Hamilton's religious liberty was accomplished through the least restrictive means. Clearly, RFRA's enactment was pivotal to the district court's decision to enjoin enforcement of the hair length regulation. In fact, prior to the enactment of RFRA, our circuit had specifically held that a similar Missouri prison hair length restriction was valid as reasonably related to legitimate penological interests. Iron Eyes v. Henry, 907 F.2d 810, 813 (8th Cir. 1990) (Iron Eyes), citing O'Lone v. Estate of Shabazz, 482 U.S. 342, 350 (1987) (O'Lone), and Turner v. Safly, 482 U.S. 78, 89-91 (1987) (Turner). Thus, the magistrate judge's conclusion that RFRA effected a dramatic change in the legal landscape of Supreme Court and Eighth Circuit precedent was *sine qua non* to his recommendation that equitable relief be granted with regard to the hair length restriction.[1]

This conclusion deserves elaboration. Before I examine the limits of Congress's power under § 5 of the Fourteenth Amendment, I find it helpful to review our court's experience over the last two decades with the Free Exercise Clause and prison hair length restrictions. In my opinion, this background underscores the appropriateness of considering the constitutional question and

---

[1]While I am inclined to believe that the denial of Hamilton's request for a sweat lodge ceremony would also justify an examination of the constitutionality of RFRA, I will, for purposes of analysis, focus on the injunction prohibiting enforcement of the hair length restriction because RFRA's effect on this claim is more easily discernible.

facilitates an appreciation of the context in which that question arises.

In 1975, our court decided Teterud. The majority opinion describes Hamilton's reliance on Teterud as "misplaced," see note 12 supra, even though it involved a similar hair length issue and was decided before O'Lone. In Teterud, a Native American inmate challenged the constitutionality of a Missouri prison regulation which prohibited him from wearing long hair. Id. at 358. The district court applied the compelling interest test of Wisconsin v. Yoder, 406 U.S. 205, 215 (1972) (Yoder), and found that the regulation was an unconstitutional restriction on the inmate's exercise of his Native American religion. Specifically, "[t]he district court found the wearing of long braided hair to be a tenet of the Indian religion sincerely held by [the inmate]. It further found that the interest of penal administration advanced by [the warden] could be served by viable, less restrictive means." Teterud, 522 F.2d at 359. We held that neither of these findings was clearly erroneous. In response to the warden's argument that, inter alia, long hair caused identification problems and presented the opportunity for contraband smuggling, we agreed with the district court's finding that the warden's justifications were either without substance or overly broad. Id. at 361.

The compelling interest test that we applied to invalidate the prison hair length restriction in Teterud, however, was not to survive the Supreme Court's decisions in O'Lone and Turner. See Iron Eyes, 907 F.2d at 813 (recognizing that Teterud was limited to its facts and that the compelling interest test had been rejecting by the Supreme Court when evaluating free exercise challenges to prison regulations).

Turner involved a Missouri prison regulation relating to inmate marriages and inmate-to-inmate correspondence. 482 U.S. at 81. The district court held that regulations allowing inmate

marriage only with the warden's permission when compelling reasons were present, and limiting inmate-to-inmate correspondence between unrelated inmates on nonlegal matters, were unconstitutional. We affirmed and applied strict scrutiny to conclude that the two regulations were not the least restrictive means of achieving the asserted goals of rehabilitation and security. Id. at 83. The Supreme Court reversed, holding that we improperly applied the heightened standard of Procunier v. Martinez, 416 U.S. 396, 413-14 (1974), and that, instead, we should have determined whether the prison regulation which burdened a fundamental right was reasonably related to a legitimate penological interest. Turner, 482 U.S. at 87. Specifically, the Court set out a four-part test under which to analyze the challenged prison regulation. Id. at 89-90. Applying this test, the Court upheld the correspondence regulation but invalidated the marriage restriction. Id. at 100.

O'Lone was decided shortly after Turner. O'Lone involved an inmate's challenge to several prison regulations which prevented Muslim inmates from attending Jumu'ah, a weekly congregational service commanded by the Koran. The Court reversed because it concluded that the court of appeals had improperly imposed a separate burden on prison officials to prove that no reasonable method existed by which prisoners' religious rights can be accommodated without creating bona fide security risks. Id. at 350. The Court again reiterated the standard that had recently been stated in Turner and stressed that this "reasonableness" test, which was less restrictive than that applied to alleged infringements of fundamental constitutional rights outside the prison context, "avoid[ed] unnecessary intrusion of the judiciary into problems particularly ill-suited to resolution by decree." Id. at 349-50 (quotation marks and citations omitted).

In the wake of these two Supreme Court decisions, we again faced an inmate's free exercise challenge to a prison hair length restriction in Iron Eyes. The plaintiff, a Sioux Indian, relied on

-31-

Teterud as support for his free exercise claim. We noted, however, the effect of O'Lone and Turner on the legal landscape of inmate challenges to prison regulations allegedly infringing upon fundamental rights, applied the less onerous reasonableness test, and held that the neutral grooming regulation was rationally related to prison security interests and therefore did not unreasonably infringe upon the inmate's fundamental right to freely exercise his religion.[2]  907 F.2d at 816.

This review of our caselaw makes clear that, but for the passage of RFRA, Hamilton could not have succeeded on his free exercise challenge to the prison hair length regulation.  Hamilton argues that, because RFRA restored the compelling interest test of Yoder, the controlling Eighth Circuit case on prison hair length regulation is once again Teterud.[3]  The magistrate judge, through

---

[2]We note that in Iron Eyes v. Henry, 907 F.2d 810 (8th Cir. 1990) (Iron Eyes), the prison did provide a procedure through which an inmate could apply for an exemption from the prohibition against long hair.  That exemption was eliminated after the appeal in Iron Eyes was taken under submission.  Id. at 815 n.7.  However, in a subsequent decision, our court affirmed a district court's decision to dismiss, on the basis of our holding in Iron Eyes, a complaint filed by an inmate who challenged the same hair length restriction at the same facility when the exemption no longer existed. Campbell v. Purkett, 957 F.2d 535 (8th Cir. 1992) (per curiam); accord Bettis v. Delo, 14 F.3d 22 (8th Cir. 1994) (upholding Missouri prison hair length regulation).

[3]In its report to the Congress on RFRA, the Senate Judiciary Committee explained:  "As applied in the prison and jail context, the intent of the act is to restore the traditional protection afforded to prisoners to observe their religions which was weakened by the decision in O'Lone v. Estate of Shabazz."  S. Rep. No. 111, 103d Cong., 1st Sess. 9 (1993), reprinted in 1993 U.S.C.C.A.N. 1892, 1899.  The Committee also found that "the compelling interest standard established set forth [sic] in the Act will not place undue burdens on prison authorities."  Id. at 11.  Finally, the Committee concluded that no special exemption for prison free exercise claims under the Act was necessary.  Id.

-32-

his analysis, implicitly accepted this argument, as do I.[4] Consequently, I believe that we are squarely faced with the question whether Congress had the power to enact RFRA and thereby supplant the Supreme Court's prior free exercise decisions, including O'Lone and Turner, and our own circuit precedent.[5]

C.

Defendants argue that RFRA is unconstitutional because Congress lacks authority under § 5 of the Fourteenth Amendment to interfere with the state's operation of its prisons. They contend that the Supreme Court has defined what rights inmates have pursuant to the Free Exercise Clause by applying the reasonableness test set forth in O'Lone and Turner. They maintain that RFRA establishes a different test applicable to prisons, and therefore, creates religious rights for prisoners that otherwise would not exist. Defendants argue that § 5 does not give Congress the power

---

[4]The magistrate judge carefully considered the "restored" compelling interest test set out in RFRA. He first made a finding that Hamilton's beliefs were sincerely held, and then concluded the hair length regulation and the prohibition against sweat lodge ceremonies substantially burdened Hamilton's exercise of his religion. While the magistrate judge recognized the compelling governmental interest in prison security, the magistrate judge determined that defendants had not satisfied their burden of demonstrating the hair length regulation was the least restrictive means of furthering that interest. The magistrate judge noted, in response to fears of contraband smuggling, that women incarcerated in Missouri correctional facilities were not required to keep short hair, and the magistrate judge also found significant the testimony of two male inmates who were photographed with long hair but not photographed again after their hair had been cut short. In Teterud v. Burns, 522 F.2d 357, 361 (8th Cir. 1975), our court affirmed the district court's rejection of similarly expressed concerns about contraband smuggling and inmate identification as inadequate justification for the hair length regulation.

[5]See Werner v. McCotter, 49 F.3d 1476, 1479 (10th Cir.) ("The recent passage of [RFRA] legislatively overturned a number of recent Supreme Court decisions, including Turner and [O'Lone], by defining a statutory (if not constitutional) right to the free exercise of religion."), cert. denied, 115 S. Ct. 2625 (1995).

to change the constitutional holdings in <u>O'Lone</u> and <u>Turner</u>. They maintain that the only basis for affirming the judgment, in light of prior precedent, is the change made by Congress in RFRA and that RFRA is an unconstitutional extension of congressional power. Defendants conclude that § 5 is not an available basis for the enactment of RFRA because it is merely an "enforcement" provision which is limited to providing remediation consistent with the goals of the Fourteenth Amendment. They therefore reason that RFRA cannot be said to be "enforcing" a religious exercise right when the Supreme Court had held that there was no such right.

Hamilton, and the government, on the other hand, maintain that RFRA's enactment represents a valid exercise of congressional authority under § 5. They argue that, because the Due Process Clause of the Fourteenth Amendment incorporates the First Amendment, nothing in § 5 limits Congress's ability to legislate the procedures to be used to vindicate free exercise claims. The government contends that Congress's § 5 power extends beyond the authority merely to prohibit specific constitutional violations by the states and that § 5 empowers Congress to legislate prophylactically by proscribing or regulating conduct that, although not unconstitutional, threatens or infringes upon the exercise of Fourteenth Amendment rights. Both Hamilton and the government contend that numerous Supreme Court decisions support their broad interpretation of Congress's power under § 5.[6] Further, the government argues that RFRA not only promotes the Fourteenth Amendment's free exercise guarantee, but also enforces

---

[6]<u>See</u> <u>City of Rome v. United States</u>, 446 U.S. 156 (1980) (holding § 5 of the Voting Rights Act of 1965 was a valid exercise of congressional power under § 2 of the Fifteenth Amendment); <u>Oregon v. Mitchell</u>, 400 U.S. 112 (1970) (<u>Mitchell</u>) (holding <u>inter alia</u> that Congress could set the age requirement for national elections but not state or local elections); <u>Katzenbach v. Morgan</u>, 384 U.S. 641 (1966) (<u>Morgan</u>) (holding § 4(e) of the Voting Rights Act was a valid exercise of Congress's enforcement power under § 5 of the Fourteenth Amendment).

the Equal Protection Clause by protecting against religious discrimination. The government states emphatically that RFRA creates a statutory, not constitutional, free exercise right. The government admits that the separation of powers doctrine protects the specific constitutional judgments of the federal courts from legislative interference, and recognizes the Supreme Court's paramount authority to interpret the Constitution; the government asserts, however, that RFRA is simply a statute that provides legislative protection for a constitutional right over and above that provided by the Constitution.

D.

As noted in the majority opinion, supra note 8, RFRA was passed in response to the Supreme Court's decision in Employment Division v. Smith, 494 U.S. 872 (1990) (Smith). In Smith, two members of the Native American Church claimed that the state unfairly denied them unemployment compensation because their religious use of peyote, which resulted in their job termination, was determined to be disqualifying "misconduct." Id. at 876. After remand to the Oregon Supreme Court for a determination as to the legality of peyote use,[7] the Supreme Court held that the Free Exercise Clause permitted Oregon to prohibit sacramental peyote use and therefore to deny the payment of unemployment benefits to the Native Americans discharged for using peyote. Id. at 890. In so holding, the Court rejected the application of the compelling interest test to free exercise claims which challenged neutral and valid laws of general applicability. Id. at 885. All parties in the present case agree that we should not, and indeed could not, decide whether the decision of the Court in Smith was correct as a matter of constitutional law. Rather, our analysis should focus on

_____

[7]The Oregon Supreme Court held that peyote use was proscribed by the state's drug laws; however, the court also concluded that this prohibition was invalid under the Free Exercise Clause. Employment Div. v. Smith, 494 U.S. 872, 875 (1990).

-35-

whether § 5 of the Fourteenth Amendment provides a basis for Congress's enactment of RFRA.[8]   For the reasons stated below, I would hold that it does not.

"The powers of the legislature are defined and limited; and that those limits may not be mistaken or forgotten, the constitution is written."  Marbury v. Madison, 5 U.S. (1 Cranch) 137, 176 (1803) (Marbury).  While the Constitution was carefully drafted to protect the states from undue intrusion by the federal government, the Supreme Court has recently reminded us that "[t]he Civil War Amendments . . . worked a dramatic change in the balance between congressional and state power over matters of race."  City of Richmond v. J.A. Croson Co., 488 U.S. 469, 490 (1989); see Oregon v. Mitchell, 400 U.S. 112, 129 (1970) (Mitchell) (Black, J.).   The most legally far-reaching of these Amendments, the Fourteenth, provides the fundamental principles of equal protection and due process of law.  Although this Amendment was enacted in response to our country's shameful history of slavery and racial discrimination, many of the protections set forth in the Bill of Rights have been applied to the states through the Due Process Clause of the Fourteenth Amendment, including the protections of the First Amendment.  See Cantwell v. Connecticut, 310 U.S. 296, 303 (1940) ("The fundamental concept of liberty embodied in that Amendment embraces the liberties guaranteed by the First Amendment.").  Section 5 of the Fourteenth Amendment states that "[t]he Congress shall have power to enforce, by appropriate legislation, the provisions of this article."  U.S. CONST. amend.

_____

[8]In a footnote to its brief, the government suggests that RFRA is also a valid exercise of congressional power under the Commerce Clause.  Brief for Plaintiff-Intervenor at 33 n.16.  We note, however, that the only basis suggested in the legislative history to RFRA, and in the main text of the government's brief, is § 5 of the Fourteenth Amendment.  For many of the same structural reasons cited in this dissenting opinion, which preclude § 5 from supporting RFRA's constitutionality, I cannot conclude, based on the very limited treatment of the issue by the government, that the Commerce Clause is a valid basis for the enactment of RFRA.

XIV, § 5.  Because it is "emphatically the province and duty of the judicial department to say what the law is," Marbury, 5 U.S. at 177, we should determine whether RFRA falls within the scope of legislative power granted to Congress by § 5, as it has been interpreted by the courts.

The issue of whether Congress's power under § 5 of the Fourteenth Amendment is the same when it acts to enforce an incorporated right as when it acts to remedy or to prevent a violation of the Fourteenth Amendment itself has not been expressly decided.  See Hutto v. Finney, 437 U.S. 678, 718 (1978) (Rehnquist, J., dissenting).  An argument could be made, based on both historical perspective and the logic of the doctrine of incorporation itself, that Congress's power to enforce incorporated rights under § 5 should be circumscribed.  See Mitchell, 400 U.S. at 129 ("Where Congress attempts to remedy racial discrimination under its enforcement powers, its authority is enhanced by the avowed intention of the framers of the Thirteenth, Fourteenth, and Fifteenth Amendments.").  The Supreme Court has not had an occasion to resolve this issue.  Nor would it be necessary, in my opinion, for this panel decide this particular issue in the present case because I believe that RFRA is unconstitutional, even assuming Congress's powers under § 5 are not variable.

The leading case on the scope of Congress's power under § 5 is Katzenbach v. Morgan, 384 U.S. 641 (1966) (Morgan).  In Morgan, the Supreme Court referred to § 5 as "a positive grant of legislative power authorizing Congress to exercise its discretion in deter-mining whether and what legislation is needed to secure the guarantees of the Fourteenth Amendment."  Id. at 651.  That case considered whether § 4(e) of the Voting Rights Act of 1965, 42 U.S.C. § 1973b(e), was "appropriate legislation" to enforce the Equal Protection Clause.  In respects pertinent to the cases under review in Morgan, § 4(e) provides that no person who has successfully completed the sixth grade in a public school in, or a

-37-

private school accredited by, the Commonwealth of Puerto Rico in which the language of instruction was other than English shall be denied the right to vote in any election because of his or her inability to read or write English.  The State of New York challenged the statute because it conflicted with the state's requirement that voters be able to read and write English.  Morgan, 384 U.S. at 643-45.  The Court, however, held that section 4(e) was "a proper exercise of the powers granted to Congress by § 5 of the Fourteenth Amendment."  Id. at 646.

New York argued that an exercise of congressional power under § 5 could only be sustained if the state law which was invalidated by the legislative action was itself violative of the Fourteenth Amendment.  The Court disagreed and held that "[a] construction of § 5 that would require a judicial determination that the enforcement of the state law precluded by Congress violated that Amendment, as a condition of sustaining the congressional enactment, would depreciate both congressional resourcefulness and congressional responsibility for implementing the Amendment."  Id. at 648.  In its discussion of the scope of § 5, the Court explained that "the draftsmen sought to grant to Congress, by a specific provision applicable to the Fourteenth Amendment, the same broad powers expressed in the Necessary and Proper Clause."  Id. at 650; see Ex parte Virginia, 100 U.S. 339, 345-46 (1879) (delineating the scope of § 5 powers); see also South Carolina v. Katzenbach, 383 U.S. 301, 326 (1966) (Katzenbach) (applying the McCulloch v. Maryland, 17 U.S. (4 Wheat.) 316 (1819), standard to the enforcement provision of the Fifteenth Amendment).

Analyzing § 4(e) under this broad standard, the Court provided two alternative bases for its conclusion that § 4(e) was a proper exercise of § 5 power.  These two bases have been referred to by the commentators as the remedial theory and the substantive theory

of § 5 power.[9]  The Court first considered a remedial justification for the enactment of § 4(e).  Explaining the enactment of § 4(e) as a measure to enforce the Equal Protection Clause, the Court stated in <u>Morgan</u>: "Section 4(e) may be viewed as a measure to secure for the Puerto Rican community residing in New York nondiscriminatory treatment by government--both in the imposition of voting qualifications and the provision or administration of governmental services . . . ."  <u>Morgan</u>, 384 U.S. at 652.  The Court further provided that the statute was plainly adapted to furthering the aims of the Equal Protection Clause because it "enable[d] the Puerto Rican minority of New York better to obtain perfect equality of civil rights and the equal protection of the laws."  <u>Id.</u> at 653 (quotation marks omitted).  The Court concluded that, where Congress has assessed and weighed the various conflicting considerations, the statute would be upheld as long as a basis could be perceived upon which Congress might have resolved the conflicting considerations as it did.  <u>Id.</u>

This conclusion, based on a remedial approach, in no way rested on the possibility that Congress determined the enactment or application of the state's English literacy requirement had as its purpose the perpetuation of invidious discrimination.  As Justice Stewart understood the first <u>Morgan</u> rationale, Congress could have

---

[9]<u>See</u> Daniel O. Conkle, *The Religious Freedom Restoration Act: The Constitutional Significance of an Unconstitutional Statute*, 56 Mont. L. Rev. 39 (1995).  Explaining the alternative rationales of <u>Morgan</u>, Justice Stewart in <u>Mitchell</u> stated:

> The Court's opinion made clear that Congress could impose on the States a remedy for the denial of equal protection that elaborated upon the direct command of the Constitution, and that it could override state laws on the ground that they were in fact used as instruments of invidious discrimination even though a court in an individual lawsuit might not have reached that factual conclusion.

400 U.S. at 296 (Stewart, J., concurring in part and dissenting in part).

concluded that "enhancing the political power of the Puerto Rican community by conferring the right to vote was an appropriate means of remedying discriminatory treatment in public services." Mitchell, 400 U.S. at 295 (Stewart, J., concurring in part and dissenting in part).  In other words, the Morgan Court concluded that, by ensuring that the Puerto Rican community was not denied that right which is "preservative of all rights," Yick Wo v. Hopkins, 118 U.S. 356, 370 (1886), Congress rationally enacted § 4(e) to "enforce and effectuate the judicially determined constitutional prohibition on racial discrimination by government." Daniel O. Conkle, *The Religious Freedom Restoration Act:  The Constitution Significance of an Unconstitutional Statute*, 56 Mont. L. Rev. 39, 47 (1995); see Fullilove v. Klutznick, 448 U.S. 448, 477 (1980) (plurality opinion).

The Court then provided a second basis for Congress's enactment of § 4(e) which it believed would also make § 4(e) "appropriate legislation" under § 5.  This was the so-called substantive theory.[10]  The Court prefaced this portion of its analysis as follows:  "The result is no different if we confine our inquiry to the question whether § 4(e) was merely legislation aimed at the elimination of an invidious discrimination in establishing voter qualifications." Id. at 653-54.  In this section, the Court reviewed the factual determination which Congress may have made regarding the particular purpose behind the New York's English literacy law.  The Court noted that Congress might have questioned both the role that prejudice played in the passage of the state law and further questioned the public policy concerns and the way in which the state legislature resolved them.  Clearly, this type of review is within the ambit of Congress's "specially informed

---

[10]While we employ this terminology occasionally throughout our opinion, we do not believe, as will be discussed later, that the second Morgan rationale for § 4(e)'s validity under § 5 is properly characterized as substantive.

legislative competence."  Id. at 656.   Thus, the Court concluded that

> it is enough that we perceive a basis upon which Congress might predicate a judgment that the application of New York's English literacy requirement to deny the right to vote to a person with a sixth grade education in Puerto Rican schools in which the language of instruction was other than English constituted an invidious discrimination in violation of the Equal Protection Clause.

Id.  In other words, Congress could look to the legislative intent behind the state law,[11] the substance of the state law, and the competing policy considerations, and form the belief that the application of the law was indeed an invidious discrimination which would violate the Equal Protection Clause, as that clause had been expounded by the Court.  Furthermore, so long as the Court could perceive a basis for this legislative judgment, the exercise of § 5 power would be valid.

When Congress acts to invalidate a law that is neutral on its face but unconstitutionally discriminatory in application or intent,[12] it necessarily employs its superior factfinding capabilities and policymaking acumen to eradicate the effects of discrimination and prevent future constitutional violations which a federal court, because of its Article III limitations, for example, may not be able to address readily.  I therefore think

_____

[11]In Morgan, the Court took notice of the evidence of the discriminatory attitudes which likely influenced the enactment in 1916 of the New York English literacy requirement.  384 U.S. at 654 n.14.

[12]Seven years before Morgan, the Supreme Court upheld a facial challenge to a North Carolina law nearly identical to the New York law struck down by § 4(e) of the Voting Rights Act.  See Lassiter v. Northampton Election Bd., 360 U.S. 45 (1959).  The Court was careful to note that the "issue of discrimination in the actual application of the ballot laws of North Carolina" had not been presented in the state court below, and would not therefore be reached.  Id. at 50.

that the second <u>Morgan</u> theory is best understood to allow Congress to address those facially neutral activities which may have unconstitutional underpinnings, and not as a rationale that grants Congress a substantive power under § 5 to define the scope of constitutional guarantees. With this understanding of <u>Morgan</u>'s alternative rationales, I proceed to consider whether § 5 can provide a basis for Congress's enactment of RFRA.

E.

I begin my analysis of RFRA with the congressional findings, 42 U.S.C. § 2000bb(a), to highlight the diametrically opposed positions of the Supreme Court and Congress on the nature of the Free Exercise Clause and to demonstrate the *a priori* quality of these congressional findings. In short, the language of these findings portrays Congress, not as a political organ well-suited to conduct the business of empirical research and policy implementation, but as a super-Supreme Court.[13] Finding (2) which states that "laws neutral toward religion may burden religious exercise as surely as laws intended to interfere with religious exercise" is clearly not the product of extensive factfinding but the result of a logician's exercise. <u>Id.</u> § 2000bb(a)(2). Finding (3) further states that "governments should not substantially burden religious exercise without compelling justification." <u>Id.</u> § 2000bb(a)(3). As the stated purposes of RFRA reveal, this finding is nothing more than the Congress's adoption of the standard set forth in the pre-<u>Smith</u> Supreme Court decisions in <u>Sherbert v. Verner</u>, 374 U.S. 398 (1963) (<u>Sherbert</u>), and <u>Yoder</u>, which the Supreme Court has specifically rejected as unworkable and

---

[13]In fact, the Senate Judiciary Committee expressly stated that "the purpose of this act [was] only to overturn the Supreme Court's decision in <u>Smith</u>." S. Rep. No. 111, at 12.

-42-

unnecessary in free exercise cases.[14]  See Smith, 494 U.S. at 888-90.  Nevertheless, Congress provided in its final stated finding that "the compelling interest test as set forth in prior Federal court rulings is a workable test for striking sensible balances between religious liberty and competing prior governmental interests."  42 U.S.C. § 2000bb(a)(5).  In essence, Congress has instructed the Supreme Court how to interpret the Free Exercise Clause of the First Amendment (that is, apply the compelling interest test), even though the Court, the entity charged by the Constitution with its application, has determined that the compelling interest test is neither feasible nor required.  It hardly needs to be said that where Congress and the Supreme Court are so clearly at odds with each other over the definition of a fundamental right, the conflict presents an obvious and serious threat to the delicate balance of the separation of powers.

In his opinion for the Court in Smith, Justice Scalia explained the problematic aspects of the compelling interest test in the context of free exercise cases:

> The government's ability to enforce generally applicable prohibitions of socially harmful conduct, like its ability to carry out other aspects of public policy, cannot depend on measuring the effects of a government action on a religious objector's spiritual development. To make an individual's obligation to obey such a law contingent upon the law's coincidence with his religious beliefs, except where the State's interest is "compelling" -- permitting him, by virtue of his beliefs, to become a law unto himself, contradicts both constitutional tradition and common sense.

---

[14]See Scott C. Idleman, *The Religious Freedom Restoration Act: Pushing the Limits of Legislative Power*, 73 Tex. L. Rev, 247, 313 (1994) ("In the specific case of RFRA . . . the relevance of Congress's factfinding capacity is not entirely obvious.  For one thing, the rejection of judicial balancing in Employment Division v. Smith was arguably a normative, and not empirically contingent, judgment about the meaning of free exercise and the nature of the judiciary.").

494 U.S. at 885 (internal citations and quotation marks omitted). The Court could not have been clearer in its expression of the view that the compelling interest test of Yoder and Sherbert should be abandoned as inconsistent with its constitutional judgment. Yet, through RFRA, Congress expressly intended "to restore the compelling interest test as set forth in [Sherbert] and [Yoder] and to guarantee its application in all cases where free exercise of religion is substantially burdened." 42 U.S.C. § 2000bb(b)(1).

Moreover, in direct contravention of the Court's analysis in Smith, the "substantially burdened" element of RFRA requires courts to weigh the centrality of an adherent's religious practice. Further exposing the failings of the compelling interest test in free exercise cases, Justice Scalia wrote: "Repeatedly and in many different contexts, we have warned that courts must not presume to determine the place of a particular belief in a religion or the plausibility of a religious claim." Smith, 494 U.S. at 887. Yet, by injecting the "substantially burdened" element into a court's RFRA analysis, Congress would require courts to weigh the extent of an alleged infringement upon a religious practice against the importance of that practice.[15] In fact, predictably, defendants in the present case have argued that RFRA does not apply to the challenged prison prohibitions because they merely "impinged" rather than "substantially burdened" Hamilton's free exercise of religion. Brief for Appellants at 16. This type of argument is exactly what troubled the Court when it explained its inability to constitutionally apply the compelling interest test to free exercise claims challenging generally applicable laws. See Smith, 494 U.S. at 888-89.

---

[15]See, e.g., Alameen v. Coughlin, 892 F. Supp. 440, 448 (E.D.N.Y. 1995) ("[T]o impose a substantial burden, government interference must be more than an inconvenience. The interference must burden a belief central to a plaintiff's religious doctrine." (citation omitted)).

Justice Scalia further explained the distinction between the application of the compelling interest test in cases of race discrimination, or the content regulation of speech, and matters of free exercise of religion: "What it produces in those other fields--equality of treatment and an unrestricted flow of contending speech--are constitutional norms; what it would produce here--a private right to ignore generally applicable laws--is a constitutional anomaly." Id. at 886. I believe that this observation sheds considerable light upon the contours of § 5 as discussed in Morgan and the validity of RFRA.

In Morgan, § 5 was held to be a valid constitutional basis for a provision of the Voting Rights Act prohibiting the use of English literacy tests as a prerequisite to suffrage. In that instance, the use of § 5 as a means of furthering the cause of equal protection was certain. Congress did not impose a standard of review for all equal protection claims which the courts were to employ generally; rather, under the remedial or first Morgan theory, Congress prohibited a particular state practice in order to root out the effects of past invidious discrimination and to reduce the possibility of future invidious discrimination. Enacting such a law is, however, qualitatively different from imposing upon the Court a standard of review for free exercise claims which overrules its prior free exercise holdings. RFRA's imposition of the compelling interest test on all free exercise claims is nothing less than a radical alteration of the Supreme Court's free exercise jurisprudence.

Under the so-called substantive or second Morgan theory, the Court concluded that Congress, after conducting its own investigation, might have rationally determined that a facially valid state law was enacted or applied so as to invidiously discriminate in violation of the Equal Protection Clause. Again, in the present case, Congress did not, in an exercise of its superior factfinding capacity, take aim at a particular neutrally-

-45-

phrased state law which it had concluded was enacted or applied unconstitutionally.    In RFRA, Congress sought to impose a heightened level of scrutiny on the federal courts for every type of case in which state or federal government substantially burdens one's religious practice.    As such, Congress abdicated its responsibility to investigate the particular state action which might have the potential of unconstitutionally burdening the free exercise of religion, and instead, Congress has required the courts to investigate, under a standard previously rejected by the Supreme Court, the myriad cases in which plaintiffs claim their religious practice has been substantially and unjustifiably burdened.  It is thus clear that the substantive or second Morgan rationale as well fails to support Congress's "restoration" of the compelling interest test to all free exercise claims brought in federal court.

I believe that what Congress has done through RFRA's passage under the banner of § 5 is dramatically different from its exercise of § 5 power in Morgan or in any other case to date.  In Smith, the Supreme Court, consistent with its constitutional duty under Marbury, concluded that the scope of the First Amendment guarantee of free exercise did not require the imposition of a heightened level of scrutiny on neutral laws of general applicability, even though such laws may burden religious practice.  When the Court so held, it was performing it most essential and solemn function:  it interpreted the scope of the Free Exercise Clause and determined that neutral laws of general applicability passed constitutional muster.  In passing RFRA, the Congress did not invalidate a state law or state prison regulation as violative of, or even inconsistent with, the goals of the Fourteenth Amendment; rather, Congress substantively altered the Supreme Court's understanding of what the Free Exercise Clause actually means.

Were we to uphold RFRA on the basis of § 5, we would, under our reading of Smith, allow Congress to impose a standard for the judicial evaluation of all free exercise claims which not only

-46-

overrules prior free exercise decisions but also, in the considered and paramount judgment of the Supreme Court, leads to constitutionally anomalous results. Where, as here, Congress acts under the aegis of § 5 to impose on the judiciary a method of analysis for the resolution of all claims based on the fundamental right of free exercise, which in the Court's view, does not produce "equality of treatment" but constitutional anomalies, such legislative action, I think, must be beyond the language and constitutional intent of § 5.[16] I believe that, through RFRA, Congress does not seek simply to enhance the protection afforded by the Free Exercise Clause, but to define it. I therefore conclude that RFRA is unconstitutional. Accord Flores v. City of Boerne, 877 F. Supp. 355, 356-57 (W.D. Tx. 1995); In re Tessier, No. 94-31615-13, 1195 WL 736461 (Bankr. D. Mont. Dec. 8, 1995).

F.

I recognize that several district court decisions have upheld RFRA as constitutional. See, e.g., Sasnett v. Department of Corrections, 891 F. Supp. 1305, 1315-21 (W.D. Wis. June 23, 1995) (Sasnett); Belgard v. Hawaii, 883 F. Supp. 510, 512-17 (D. Haw. 1995) (Belgard) (followed by Abordo v. Hawaii, 902 F. Supp. 1220, 1229-34 (D. Haw. 1995)). However, I disagree with the reasoning of those cases. In Belgard, much like the present case, the plaintiff was a Native American who challenged various prison regulations

---

[16]See City of Richmond v. J.A. Croson Co., 488 U.S. 469, 490 (1989) ("The power to 'enforce' may at times also include the power to define situations which *Congress* determines threaten principles of equality and to adopt prophylactic rules to deal with those situations."); see also Christopher V. Eisgruber & Lawrence G. Sager, *Why the Religious Freedom Restoration Act is Unconstitutional*, 69 N.Y.U. L. Rev. 437, 453-54 (1994) ("RFRA's compelling state interest test privileges religious believers by giving them an ill-defined and potentially sweeping right to claim exemption from generally applicable laws, while comparably serious secular commitments -- such as those flowing from parental obligation, philosophical conviction, or lifelong cultural practice -- receive no such legal solicitude.").

-47-

including a hair length restriction. 883 F. Supp. at 511. Hawaii argued that RFRA was unconstitutional because it represented "congressional usurpation of functions entrusted exclusively to the judiciary, including delineation of the boundaries of constitutional rights and calibration of the proper balance between competing interests of constitutional magnitude." Id. at 513. Rejecting the state's argument, the district court relied heavily on Morgan. Specifically, the district court made much of the fact that the Supreme Court declined to overrule Lassiter v. Northampton Election Bd., 360 U.S. 45 (1959) (Lassiter), and, "despite the statute's vitiation of Lassiter, sustained the constitutionality of section 4(e) of the Voting Rights Act." Belgard, 883 F. Supp. at 514. The district court, seizing upon the substantive or second Morgan theory, stated that the Supreme Court's alternate rationale for sustaining § 4(e) was "a legislative judgment that the literacy requirement violated the Equal Protection Clause per se." Id. Because of this apparent direct conflict between Lassiter and § 4(e), the district court concluded that Congress had the power to "expressly disagree with the Court as to the reach of constitutional rights." Id. (citation omitted).

I believe the district court in Belgard read the scope of the Morgan holding too broadly. To properly understand the limits of the substantive or second Morgan theory, I revisit Lassiter. In that case, the plaintiffs brought only a facial challenge to a North Carolina literacy requirement nearly identical to the New York requirement in Morgan. As noted in Belgard, the Court concluded that "'literacy and illiteracy are neutral on race.'" Id. at 515 (quoting Lassiter, 360 U.S. at 51). However, the Lassiter Court importantly noted: "Of course a literacy test, fair on its face, may be employed to perpetuate that discrimination which the Fifteenth Amendment was designed to uproot. No such influence is charged here." 360 U.S. at 53. The Lassiter holding did not preclude the possibility that a constitutional challenge to the application of the North Carolina literacy requirement might

not be successful.  See Katzenbach, 383 U.S. at 333.  This sheds considerable light on the substantive or second Morgan theory of § 5 power.  The Supreme Court simply noted that, under § 5, Congress could examine the effect of, and the policy decisions behind, a literacy requirement and determine that "the application of New York's literacy requirement" was invidious discrimination. Morgan, 384 U.S. at 656.  Thus, Lassiter and Morgan were not constitutionally inconsistent.[17]  The Morgan Court did not, by implication, provide that Congress could disagree with the Supreme Court's constitutional judgment; rather, Morgan provided that Congress could determine that a literacy requirement, adjudged to be facially valid, may in application constitute invidious discrimination in violation of the Fourteenth Amendment's Equal Protection Clause.  Therefore, I believe the district court in Belgard was incorrect to conclude that "Morgan held that Congress acted within its enforcement authority under section 5 of the Fourteenth Amendment when, pursuant to section 4(e) of the Voting Rights Act, it limited prior Supreme Court doctrine in order to expand a right guaranteed by the Fourteenth Amendment."  Belgard 883 F. Supp. at 516.  By failing to appreciate the limits of Lassiter, the district court in Belgard implied that the Supreme Court's decision in Morgan interpreted § 5 more broadly than it actually did.

I find Sasnett equally unavailing.  Sasnett involved a challenge brought by a number of Wisconsin prison inmates against prison rules regulating the types of personal property they could possess.  In holding RFRA constitutional, the district court in Sasnett also placed great reliance on Morgan.  The court followed

---

[17]But see Note, *When The Supreme Court Restricts Constitutional Rights, Can Congress Save Us?  An Examination of Section 5 of the Fourteenth Amendment*, 141 U. Pa. L. Rev. 1029, 1061 (1993) (concluding that the second Morgan theory "holds that Congress can expressly disagree with the Court as to the reach of constitutional rights").

a line of reasoning similar to that of <u>Belgard</u> and concluded: "<u>Lassiter</u> was to the Voting Rights Act what <u>Smith</u> is to the Religious Freedom Restoration Act." 891 F. Supp. at 1317. It should be clear from my analysis thus far that I believe the <u>Belgard</u> and <u>Sasnett</u> courts have read <u>Lassiter</u> too broadly and thereby perceived a false conflict between <u>Lassiter</u> and <u>Morgan</u>. <u>Lassiter</u>'s holding was clearly limited to the facial challenge to the North Carolina literacy requirement. In <u>Morgan</u>, the Court simply determined that Congress's judgment that the facially neutral literacy requirement was *in application* an example of invidious discrimination violative of equal protection would not be upset as long as the Court could perceive a basis for this conclusion. A proper understanding of the precise interplay of these two Supreme Court decisions demonstrates the limits of <u>Morgan</u>. <u>Morgan</u> does not support the passage of RFRA as a valid exercise of § 5 power.

The <u>Sasnett</u> court also offered an alternative remedial justification for Congress's use of § 5 power to enact RFRA. Under this approach, the district court concluded that "Congress has not attempted to define the First Amendment; rather, it has merely prohibited otherwise lawful activity as a means of further enforcing constitutional rights." 891 F. Supp. at 1318. This is, in essence, the "statutory, not constitutional" right argument which the government advances in the present case. The <u>Sasnett</u> court found it "obvious" that RFRA is a rational means of safeguarding the core constitutional right to free exercise, as judicially defined." <u>Id.</u> Explaining Congress's intent in passing RFRA, the district court continued: "Congress determined that requiring plaintiffs to prove that state actors intended to discriminate on the basis of religion creates an evidentiary barrier to the full protection of constitutional rights. . . . It was wholly rational for Congress to have concluded that [RFRA] would add greater protection to First Amendment guarantees." <u>Id.</u> at 1319.

Again, I believe that the <u>Sasnett</u> court's reliance on <u>Morgan</u> was misplaced. The <u>Sasnett</u> court concluded that the only way RFRA "substantively altered the scope of federal rights to free religious exercise was by obviating proof of discriminatory intent on the part of state actors." <u>Id.</u> However, I believe there is an important difference between a congressional enactment which invalidates a state law or practice in the absence of discriminatory intent, <u>see</u> <u>Morgan</u>, 384 U.S. at 652-53; <u>see also</u> <u>City of Rome v. United States</u>, 446 U.S. 156 (1980), and a congressional enactment which summarily imposes an across-the-board standard for the evaluation of free exercise claims that the Supreme Court has criticized and abandoned. Through RFRA's passage, Congress did not attempt to root out a particular evil, such as literacy tests, which were often means for perpetuating racial discrimination, but simply expressed the normative judgment that "governments should not substantially burden religious exercise without compelling justification." 42 U.S.C. § 2000bb(a)(3). This is the role given to the Supreme Court, not Congress, by the Constitution.

RFRA is neither remedial nor supplemental, but definitional. <u>Morgan</u> upheld a law which, as the Court indicated, Congress might have rationally concluded would either remedy past invidious discrimination or prevent future discriminatory conduct. In RFRA, however, Congress establishes a rejected method of analysis for all free exercise claims simply because Congress interprets the Free Exercise Clause differently than the Supreme Court. This is not prophylaxis but unconstitutional interbranch hegemony. As Justice Harlan stated in <u>Mitchell</u>, "[to] allow a simple majority of Congress to have final say on matters of constitutional interpretation is . . . fundamentally out of keeping with the constitutional structure." 400 U.S. at 205 (Harlan, J., concurring in part and dissenting in part). Consequently, I would hold that the enactment of RFRA was not a valid exercise of § 5 power. To hold otherwise would be inconsistent with the essence of judicial

review and the separation of powers. See Flores v. City of Boerne, 877 F. Supp. 355 (W.D. Tex. 1995) (holding RFRA unconstitutional under the separation of powers doctrine). Section 5 grants Congress the power to supplement, not subvert, the Supreme Court's underlying constitutional jurisprudence.

III.

Because Congress does not have the power under § 5 of the Fourteenth Amendment to enact RFRA, I would hold that the Religious Freedom Restoration Act is unconstitutional.[18] Accordingly, I would vacate the judgment of the district court and remand the case for further proceedings.


A true copy.

Attest:


CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.

---

[18]Because I would hold that Congress was without power to enact RFRA under § 5 of the Fourteenth Amendment, I would not reach defendants' arguments that RFRA violates the Tenth Amendment and, as applied, violates the Establishment Clause.