# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 06-3473

_____

Michael J. Fegans,                              *
                                                *
          Appellant,                            *
                                                *
     v.                                         *
                                                *
Larry Norris, Director, Arkansas                *     Appeal from the United States
Department of Corrections, in his               *     District Court for the
individual and official capacities; Greg        *     Eastern District of Arkansas.
Harmon, Warden, East Arkansas                   *
Regional Unit of the Arkansas                   *
Department of Corrections, in his               *
individual and official capacities; John        *
Lowe, Assistant Warden, in his                  *
individual and official capacities; Moses*
Jackson, Captain, in his individual and         *
official capacities; Gary Cox, Chaplain,        *
in his official capacity; Michael               *
Humphrey, Sargent, in his individual            *
and official capacities (originally sued        *
as M. Humphries); Don Yancey,                   *
Chaplain, in his official capacity              *
(originally sued as Don Yancy); Albert          *
McKinney, Chaplain, in his official             *
capacity (originally sued as McKinney),         *
                                                *
          Appellees.                            *

Submitted:  October 19, 2007

Filed:  August 11, 2008 (Corrected: 08/12/2008)

_____

Before RILEY, MELLOY, and COLLOTON, Circuit Judges.

_____

COLLOTON, Circuit Judge.

Michael J. Fegans, an inmate in Arkansas, brought this suit against the director of the Arkansas Department of Corrections ("ADC"), Larry Norris, and other prison officials, alleging violations of his rights under the First and Fourteenth Amendments, the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc-1 *et seq.*, the Arkansas Constitution, and the Arkansas Civil Rights Act. Fegans, a follower of the teaching of the Assemblies of Yahweh, claimed that the ADC's failure to provide Kosher meals and a religious exemption from its grooming policy created a substantial burden on the exercise of his religious beliefs that could not be justified under federal or state law.  The district court[1] agreed with Fegans in part, ruling that Fegans had a clearly established constitutional right to receive Kosher meals and awarding him $1500 in damages.  The district court disagreed, however, with Fegans' challenge to the grooming policy, and determined that the policy was constitutional and consistent with RLUIPA.  Fegans appeals both the amount of damages awarded and the district court's decision on the grooming policy. We affirm.

_____

[1]The Honorable James M. Moody, United States District Judge for the Eastern District of Arkansas.

-2-

On December 12, 1991, Fegans was sentenced to 18 years' imprisonment for four counts of aggravated robbery, one count of second degree battery, and one count of criminal attempt to escape. In 1994, Fegans received a major disciplinary sanction after attempting to escape and possessing a weapon and drugs. In that incident, Fegans was able to smuggle a firearm, shotgun shells, smoke grenades, marijuana, and a large amount of cash through an air-conditioning vent, and to have the items placed in a maintenance van to which he was assigned. (T. Tr. 293, 326). Fegans testified that around this same time, he underwent a religious conversion, inspired by the radio broadcasts of Jacob O. Meyer. Fegans began studying the teachings of Meyer and the Assemblies of Yahweh, a Christian sect which requires its members to follow Old Testament law. Fegans eventually concluded that he should follow a Kosher diet and refrain from "rounding the corners" of his hair and beard.

Fegans stopped trimming his hair and beard in 1995. In June 1997, Fegans formally notified the ADC that he was a follower of the Assemblies of Yahweh and began requesting a Kosher diet. While the ADC's policy at the time apparently allowed Fegans to wear his hair and beard as he wished, the ADC advised Fegans that Kosher meals were not an option and placed him on a pork-free diet instead. Fegans protested the ADC's meal policy, and eventually exhausted his administrative remedies on this claim.

On April 20, 1998, Director Norris issued Administrative Directive 98-04 ("AD 98-04"), which set forth a new grooming policy for all Arkansas prisons. The policy requires all male prisoners to keep their hair above their ears and no longer than the middle of the nape of the neck in the back. The policy allows female prisoners to wear shoulder-length hair. A separate provision prevents male inmates from wearing "facial hair other than a neatly trimmed mustache," but provides an exception for inmates diagnosed with dermatological problems, such as pseudofolliculitis barbae,

a medical condition that causes painful bumps from shaving. Inmates with such a "diagnosed dermatological problem" are permitted to "wear facial hair," provided that it is kept "no longer than 1/4 inch." The policy's stated purpose is "[t]o provide for the health and hygiene of incarcerated offenders, and to maintain a standard appearance throughout the period of incarceration, minimizing opportunities for disguise and for transport of contraband and weapons." The policy went into effect immediately.

On April 28 and May 5, 1998, Fegans was approached by an ADC officer and ordered to get a haircut. Fegans refused, stating that cutting his hair was against his religion. The ADC issued Fegans a major disciplinary sanction for each refusal, and eventually transferred him from the Cummins Unit in Grady to the East Arkansas Regional Unit ("EARU") in Brickeys. Fegans continued to resist the grooming policy while at the EARU, and continued to receive disciplinary reports as a result of his failure to comply. In an effort to secure compliance, the ADC gradually stripped Fegans of privileges and ultimately transferred him first to a maximum security cell and then to the Varner Supermax Unit.

Fegans brought suit against several ADC officials on March 14, 2003, claiming that the ADC's failure to provide Kosher meals and a religious exemption to the grooming policy violated his constitutional rights and RLUIPA. Following a bench trial, the district court determined that Director Norris had violated Fegans's firmly established constitutional right to receive Kosher meals. The court relied on its previous holding in *Love v. Evans*, 2:00-cv-0091 (E.D. Ark. Dec. 19, 2002), where it held that the ADC was required to accommodate an inmate's requests for Kosher meals. Because the ADC did not begin providing Kosher meals until March 3, 2004, the district court found that Norris "knowingly violated established law requiring Kosher diets" from December 19, 2002, through March 3, 2004, and awarded Fegans $1500 in damages.

The district court found that Fegans had a sincere religious objection to the grooming policy, but rejected Fegans's challenges to the policy. The court reasoned that this court's decision in *Hamilton v. Schriro*, 74 F.3d 1545 (8th Cir. 1996), foreclosed Fegans's claims based on the First Amendment. The court also rejected Fegans's challenge under RLUIPA, holding that the grooming policy served compelling state interests and was "no more restrictive than necessary to further its stated goals." While Fegans testified that he would have been satisfied to abide by the women's hair-length regulation, and thus implied that it presented a less restrictive means available to meet the ADC's security concerns, the district court disagreed, finding that "[t]he security concerns attendant female inmates housed in a single unit are not as great." The court rejected Fegans's Equal Protection claim for the same reason, concluding that different security concerns presented by male and female inmate populations provide a sufficient basis for the distinction in the grooming regulations. The court also ruled that the defendants were immune from suit on the state law claims, because Fegans's "conclusory allegations that Defendants acted with malice [were] not supported by the evidence." In this appeal of the district court's judgment after a bench trial, we consider legal issues de novo and review the court's finding of fact for clear error. *Eckert v. Titan Tire Corp.*, 514 F.3d 801, 804 (8th Cir. 2008).

## II.

### A.

Prison inmates retain constitutional rights protected by the First Amendment, including the right to free exercise of religion. *O'Lone v. Shabazz*, 482 U.S. 342, 348 (1987). These rights are limited, however, by the fact of incarceration and valid penological objectives, such as deterrence of crime, rehabilitation of prisoners, and institutional security. *Id.* The evaluation of penological objectives in this context is "committed to the considered judgment of prison administrators," and to ensure

appropriate deference to those judgments, courts review prison regulations alleged to infringe constitutional rights under a "reasonableness" test that is less restrictive than ordinarily applied to alleged infringements of fundamental constitutional rights. *Id*.; *see also Turner v. Safley*, 482 U.S. 78, 87-91 (1987).

Congress has granted additional protection for religious exercise by institutionalized persons. The RLUIPA, enacted in 2000, succeeded a similar statute, the Religious Freedom Restoration Act (RFRA), which failed to pass constitutional muster as a valid exercise of Congress's power under the Fourteenth Amendment, insofar as it applied to the States. *See City of Boerne v. Flores*, 521 U.S. 507 (1997). RLUIPA, like RFRA, provides that no government shall impose a "substantial burden" on the religious exercise of an inmate, even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden (1) is in furtherance of a compelling governmental interest, and (2) is the least restrictive means of furthering that compelling governmental interest. 42 U.S.C. § 2000cc-1. The Supreme Court has remarked that "context matters" in the application of this "compelling governmental interest" standard, and that RLUIPA does not "elevate accommodation of religious observances over an institution's need to maintain order and safety." *Cutter v. Wilkinson*, 544 U.S. 709, 722 (2005). Indeed, the Court noted that lawmakers who supported RLUIPA were "mindful of the urgency of discipline, order, safety, and security in penal institutions," *id.* at 723, and expected that courts would apply the Act with "due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources." *Id.* (quoting 146 Cong. Rec. S7774, S7775 (July 27, 2000) (joint statement of Sen. Hatch and Sen. Kennedy on RLUIPA)).

We applied these standards, through RFRA, to a prison hair-length regulation in *Hamilton v. Schriro*, 74 F.3d at 1551-55, and much of Fegans's argument against the ADC's hair-length regulation is foreclosed by the reasoning of *Hamilton*. The

regulation at issue in *Hamilton*, which prohibited male inmates from wearing their hair below the collar, was supported by testimony from prison officials who explained that "inmates could conceal contraband, including dangerous materials, in their long hair," and that long hair "could also cause problems with inmate identification." *Id.* at 1548. The officials suggested that a more liberal policy would place a strain on prison resources and inmate-staff relations because, in the absence of a policy, "prison staff would be required to perform more frequent searches of inmates, which could cause conflicts between staff and inmates." *Id.*

In holding that the regulation did not conflict with RFRA, we cited Congress's expectation "that the courts will continue the tradition of giving due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources." *Id.* at 1554 (quoting S. Rep. No. 111, 103rd Cong., 1st Sess. (1993), *reprinted in* 1993 U.S.C.C.A.N. 1892, 1899-1900). We observed that while RFRA reinstated the "balancing test" that had been applied by some courts to free exercise claims of inmates prior to the Supreme Court's decision in *O'Lone*, the pre-*O'Lone* case law nonetheless emphasized that "judgments regarding prison security 'are peculiarly within the province and professional expertise of corrections officials, and, in the absence of *substantial* evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters.'" *Id.* at 1553 (emphasis in original) (quoting *Pell v. Procunier*, 417 U.S. 817, 827 (1974)). Our opinion in *Hamilton* thus gave deference to "the prison officials' testimony that long hair presented a risk to prison safety and security and that no viable less restrictive means of achieving that goal existed," and upheld the hair-length restriction. *Id.* at 1555; *accord Diaz v. Collins*, 114 F.3d 69, 73 (5th Cir. 2001); *Harris v. Chapman*, 97 F.3d 499, 504 (11th Cir. 1996).

These observations about RFRA are equally applicable to RLUIPA, *see Murphy v. Mo. Dept. of Corrections*, 372 F.3d 979, 987-88 (8th Cir. 2004); *Hoevenaar v. Lazaroff*, 422 F.3d 366, 370 (6th Cir. 2005), and the rationale of *Hamilton* thus applies with equal force in this case. As in *Hamilton*, the prison officials here testified that the policy was "all about security," and that it was designed to minimize the smuggling of contraband and to reduce the opportunity for disguise. To underscore the reality of these concerns, Norris and another correctional officer pointed to specific examples showing that inmates had used their hair to conceal contraband and to change their appearance after escaping. (T. Tr. 161-63, 169, 175, 228). Norris testified that there was no less restrictive means to address ADC's security concerns, both because longer hair created a greater opportunity for inmates to conceal contraband, and because correctional officers are placed at risk of assault if they are required to search through the long hair of individual inmates. (T. Tr. 279-80). We see no basis to distinguish these safety and security concerns from those deemed sufficient in *Hamilton*.

The partial dissenting opinion attempts to distinguish *Hamilton* by relying on a snippet from an unpublished opinion in *Pounders v. Kempker*, 79 F. App'x 941 (8th Cir. 2003), where the panel noted that the record in *Hamilton* had been "fully developed as to the prison officials' basis for denying the inmate's requests." The dissent asserts that the record in this case was not so developed. A look beyond the snippet to context, however, demonstrates that *Pounders* reviewed a district court's *pre-service dismissal* of an inmate's complaint. By a record that was "fully developed" in *Hamilton*, the *Pounders* panel meant a "hearing at which various officials testified," as opposed to the record in *Pounders*, which included nothing but the complaint. *Id.* at 943. The record here, of course, involves a hearing at which various officials testified; it includes a complete bench trial conducted over three days with ten witnesses.

The dissent also relies on *Teterud v. Burns*, 522 F.2d 357 (8th Cir. 1975), which refused to defer to a prison warden's opinion on "hair net and reidentification requirements," because it was "unsupported by empirical proof." *Id.* at 361. *Hamilton* distinguished *Teterud*, holding that "the hair length regulation was founded on the legitimate concern that prison safety would be compromised by inmates concealing contraband in their long hair or identifying with a particular gang." 74 F.3d at 1555 n.11. So too here. *Hamilton* relied for "empirical proof" on the testimony of prison officials, "based on their collective experience in administering correctional facilities," that "prison security requires them to prevent inmates from concealing contraband in their long hair." *Id.* at 1554-55. The district court here relied on testimony of experienced prison officials, who opined that the hair-length policy was necessary to prevent inmates from concealing contraband in their long hair or changing appearance after an escape, and who described specific (*i.e.*, empirical) examples of inmates who had done just these things under a previous policy that permitted long hair. There is no material distinction between this case and *Hamilton*. *See also Rogers v. Scurr*, 676 F.2d 1211, 1215-16 (8th Cir. 1982) (pre-*O'Lone* decision vacating district court injunction against policy prohibiting the wearing of caps and robes outside prayer meetings, where explanation of prison officials that the attire "makes it too easy to conceal contraband" was "eminently reasonable").

This case is unlike *Murphy v. Missouri Department of Corrections*, 372 F.3d 979, a summary-judgment decision in which the court found a genuine issue of material fact concerning whether the prison's refusal to permit group worship by white separatists was necessary to prevent racial violence. *Murphy* did not require evidence that racial violence "had in fact occurred in the form of a riot," but said that "some evidence" must be presented to show that the prison's decision was the least restrictive means necessary to preserve its security interest. It was not clear in *Murphy* that the prison had considered any other options; the only evidence presented was testimony suggesting that the inmate was a racist, and that his religion limited participation to Anglo-Saxon individuals. Arkansas officials, by contrast, not only

considered other options, they *tried* one.  Under the former ADC policy, which permitted long hair, prison officials found that use of long hair to conceal contraband or to change appearance after an escape *had in fact occurred*.  The district court's decision is thus entirely consistent with *Murphy*'s requirement that "some evidence" short of an actual incident be presented in support of a challenged policy.

Fegans argues alternatively that the uniform hair-length regulation for male inmates is not the least restrictive means available, because the ADC is able to address safety and security concerns in the women's barracks while allowing shoulder-length hair.  In contrast to male prisoners, however, female prisoners are housed in a single unit, and thus have less opportunity to obtain and transport contraband.  *See Kellensworth v. Norris*, No. 5:98-cv-00157-SWW, slip op. at 5 (E.D. Ark. Feb. 22, 1999) ("Since most female inmates are housed in a single unit, the security concerns attendant with daily transfers of male inmates are not nearly as great.") (reproduced at R. Doc. 183-2).  Based on his more than thirty years with the ADC, Norris gave this further explanation for the distinction in hair-length policy:  "Women are not generally as violent as men.  They are not as escape prone as men.  They are not as prone to give us problems with contraband as men."  (T. Tr. 237-38).  Unlike the situation in *Warsoldier v. Woodford*, 418 F.3d 989, 1000-01 (9th Cir. 2005), the record here includes no data to refute Norris's expert testimony about the relative security risks in the male and female facilities, and the district court credited Norris's unrebutted testimony.  This finding of fact is not clearly erroneous, and given that factual premise, the district court correctly held that the differing hair regulations for men and women did not undermine the ADC's contention that its hair-length regulation for males was the least restrictive means available to satisfy security concerns.[2]

---

[2]Without confronting the "clear error" standard of review applicable to findings of fact, the dissent rejects the district court's decision to credit Norris's testimony about the relative security risks of male and female inmates, and launches into an inapposite discussion of which party bears the burden of proof.  *Post*, at 20-22.  In

Fegans also claims that AD 98-04 is not the least restrictive means available, because other prison systems employ more liberal grooming policies. These other policies, however, were rejected by Norris and the ADC as less effective in meeting the ADC's security and safety concerns.[3] We concluded in *Hamilton* that "[a]lthough prison policies from other jurisdictions provide some evidence as to the feasibility of implementing a less restrictive means of achieving prison safety and security, it does not outweigh the deference owed to the expert judgment of prison officials who are infinitely more familiar with their own institutions than outside observers." *Hamilton*, 74 F.3d at 1556 n.15. Norris opined that more liberal policies would be less effective in the ADC, because he had seen one of these policies at work in the past, and "our

*Warsoldier*, the Ninth Circuit rejected a prison's argument that women inmates were "much less likely" to commit violent crimes than male inmates, because the data submitted by the prison to support its position did not focus on the relevant type of institution, and did not clearly bear out the prison's assertion. 418 F.3d at 1000-01. Here, the prison relied instead on historical testimony of the director of the ADC that female inmates are not as prone to create problems with contraband as are male inmates. The district court credited this testimony and found that it satisfied the burden of proof. While Fegans did not bear the burden of proof on this issue, he was free to present countervailing evidence. The dissent evidently would go beyond the Ninth Circuit in *Warsoldier* and require that the ADC make a formal statistical presentation to support the testimony of experienced prison officials. This approach is contrary to the law of our circuit, and we decline to adopt it. *See Hamilton*, 74 F.3d at 1554 (upholding prison hair length regulation based on testimony of prison officials).

[3]The dissent cites a moment in Norris's testimony during which he is unable to recall the details of the alternative grooming policies considered by the prison nine years earlier. *Post*, at 19. At other points, however, Norris explained that his staff, in 1997, had provided a memorandum detailing the hair and grooming policies of five other States and the Federal Bureau of Prisons, (App. of Exh's at 3), that this memorandum played a role in formulating the ADC policy, (T. Tr. 233), and that prison officials considered other alternatives during their deliberations. (T. Tr. 240, 278-80). Norris also discussed two other alternatives raised by counsel during the trial. (T. Tr. 290-91, 324).

security wasn't nearly as good then as it is now." Fegans did not effectively rebut this testimony.

Finally, Fegans proposes that a less restrictive alternative would be to house inmates seeking a religious exemption in administrative segregation, apart from the general inmate population, in order to alleviate security concerns. This proposal, however, does not lessen the safety risk to correctional officials assigned to pat down the prisoners, and it would place a strain on the ADC's facilities, which are already full. *See Cutter*, 544 U.S. at 723 (observing that lawmakers supporting RLUIPA expected that courts would apply the statute with deference to the expertise of prison administrators who must act "consistent with consideration of costs and limited resources"). Because this option, like the others proposed by Fegans, would allow accommodation of religious observances to override other significant state interests, *see id.* at 722, we agree with the district court that AD 98-04 withstands scrutiny under RLUIPA.

Fegans's constitutional claims fail under the applicable "reasonableness" standard. *O'Lone*, 482 U.S. at 349; *Turner*, 482 U.S. at 89. As we noted in *Hamilton*, "'when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests.'" 74 F.3d at 1550 (quoting *Turner v. Safley*, 482 U.S. 78, 89 (1987)). Given the district court's unassailable finding that long hair poses a threat to security, the ADC's hair-length regulation does not violate an inmate's constitutional right to the free exercise of his religion. *Hamilton*, 74 F.3d at 1551; *Iron Eyes v. Henry*, 907 F.2d 810, 813 (8th Cir. 1990). For similar reasons, the ADC regulation does not violate Fegans's constitutional right to equal protection of the laws. As the factual record stands in this case, the district court did not err in concluding that the ADC has a valid reason for differing hair-length rules for men and women, and that the regulations are "reasonably related" to the State's legitimate, penological interests of safety and security.

B.

Fegans also contends that the requirement of the grooming policy that he shave his beard violates his rights under the First Amendment and RLUIPA. In explaining the justification for this rule, Norris testified that the prohibition on facial hair "keeps [inmates] from being able to change their appearance," and makes it easier for law enforcement to track and identify an inmate after an escape. Norris also suggested that long beards, like long hair, facilitate the transport of contraband. These safety and security concerns are compelling governmental interests. *See Cutter*, 544 U.S. at 725 n.13.

Fegans acknowledges that institutional security is a compelling interest, but argues that the shaving requirement is not the least restrictive means available to address these concerns. He observes that the ADC grants a medical exemption from the shaving requirement for inmates with a diagnosed dermatological condition, and contends that this exemption shows that the ADC can permit facial hair without endangering institutional security.

The ADC's medical exemption does not win the day for Fegans, because he has not been disciplined merely for growing facial hair consistent with that exemption (i.e., facial hair that does not exceed a quarter-inch in length), and he did not communicate to the ADC or testify at trial that the medical exemption would satisfy his religious beliefs. Rather, Fegans testified that his religion requires that he refrain from "rounding the corners" of his beard, and he was disciplined for wearing a beard that was uncut altogether. The beard permitted by the medical exemption has rounded corners, and we therefore presume that it is not satisfactory to Fegans. This is not a case, therefore, in which the ADC grants an exemption to some inmates for medical reasons, but refuses to grant the same exemption to another inmate for religious reasons. *Cf. Fraternal Order of Police Newark Lodge No. 12 v. City of Newark*, 170 F.3d 359, 366-67 (3d Cir. 2003). We need not decide whether such a distinction

-13-

would be permissible under RLUIPA or the First Amendment, because the record does not present the question.[4]

On this record, the ADC disciplined Fegans for wearing an uncut beard. The record shows that uncut beards create safety and security concerns that are not presented by clean-shaven faces or quarter-inch beards. Norris explained at trial that an uncut beard would make identification more difficult and would facilitate the smuggling of contraband. An uncut beard creates a better disguise for an escapee than a quarter-inch beard, because it conceals the contours of an inmate's face. (T. Tr. 262). And an uncut beard allows a prisoner to transport contraband, while a quarter-inch beard is too short to serve that purpose. *See Green v. Polunsky*, 229 F.3d 486, 490 (5th Cir. 2000). In applying this policy to Fegans, prison officials were aware of his disciplinary history, which included two previous escape attempts and the smuggling of contraband within the prison. (T. Tr. 293-94, 326). We therefore agree with the district court that the ADC demonstrated a compelling penological interest in prohibiting Fegans from wearing an uncut beard, and that this prohibition was the least restrictive means available to further that interest.

For all of its criticism of the ADC's grooming policies, the dissent, in the end, is not prepared to order the prison to permit Fegans to grow long hair and a full beard. Rather, the dissent urges "a remand to give the prison the opportunity to conduct the individualized review RLUIPA requires." *Post*, at 23. We do not agree with the implication that RLUIPA calls for the federal courts to impose procedural

---

[4]Security concerns underlying a grooming policy that governs inmates may differentiate such a policy from a similar rule applicable to police officers or other public employees. Where one purpose of a prohibition on beards is to prevent inmates from changing appearance in the event of escape, there may be good reason to distinguish between inmates with a dermatological condition, if it permanently precludes shaving (and a corresponding change in appearance), and inmates with no skin condition who could alter their appearances after an escape.

requirements on the internal disciplinary processes used by prison administrators. Fegans was afforded individualized consideration at a bench trial in which the ADC was required to prove that the burden imposed on Fegans' religious exercise by the grooming regulations was the least restrictive means of furthering the compelling governmental interests in order, safety, and security. Moreover, particularly given the Supreme Court's emphasis in *Cutter* on giving "due deference to the experience and expertise of prison and jail administrators in establishing *necessary regulations* and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources," 544 U.S. at 722 (emphasis added) (internal quotation omitted), we do not interpret RLUIPA to prevent a prison from applying certain important security regulations to all inmates without providing for exemptions. *See Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 436 (2006) ("We do not doubt that there may be instances in which a need for uniformity precludes the recognition of exceptions to generally applicable laws under RFRA.").

Fegans's constitutional challenges to the prohibition on uncut beards fail for the same reasons. The ADC has established that it has a compelling interest in safety and security, and that the grooming policy is "reasonably related" to those interests. *See O'Lone*, 482 U.S. at 349.

C.

Fegans claims that the district court abused its discretion in awarding only $1500 in damages for the ADC's failure to provide Kosher meals. Aside from punitive damages, the Prison Litigation and Reform Act limits recovery for mental or emotional injury to nominal damages only. *Royal v. Kautzky*, 375 F.3d 720, 723 (8th Cir. 2004). We conclude that an award of $1.44 for each constitutional violation is a sufficient nominal damage award, and that the district court did not abuse its discretion in declining to award a greater amount. *See id.* at 724 (affirming award of

-15-

one dollar in nominal damages). To the extent that Fegans appeals the district court's refusal to award punitive damages, we discern no abuse of discretion. The district court accurately stated the legal standard for an award of punitive damages, but found that Norris and the ADC did not act with malice, and that punitive damages were not warranted to deter future unlawful conduct, because the ADC already had instituted a policy for providing Kosher meals. These reasons are sufficient to support the court's ruling.

## D.

Fegans also challenges the district court's dismissal, with prejudice, of his state law claims. As the district court held, employees of the State of Arkansas acting in their official capacity are immune from civil suits for damages. *See Fegans v. Norris*, 89 S.W.3d 919, 924 (Ark. 2000). While prison officials acting in their individual capacities may be liable for damages if they act with malice, *id.* at 924-25; *Grine v. Bd. of Trustees*, 2 S.W.3d 54, 58 (Ark. 1999), the district court did not clearly err in finding that Fegans failed to present evidence of malice. Accordingly, the district court properly dismissed the state law claims.

For the foregoing reasons, we affirm the judgment of the district court.

\*       \*       \*

MELLOY, Circuit Judge, concurring in part and dissenting in part.

I join the majority opinion except for Sections II.A and II.B. Because I disagree with the majority's conclusions regarding Fegans's RLUIPA claims and would reverse and remand, I respectfully dissent.

-16-

RLUIPA requires strict scrutiny. 42 U.S.C. § 2000cc-1(a). While I agree with the majority that "context matters" in the application of RLUIPA's strict-scrutiny standard and that we must accord "due deference to the experience and expertise of prison and jail administrators" in applying RLUIPA, ante at 6 (quotation omitted), I believe the majority accords Norris's conclusory justifications a level of deference that is contrary to RLUIPA. Under RLUIPA, prison officials have the burden of establishing that their policy is the least restrictive means to achieve a compelling government interest. Id.; see also Schriro v. Hamilton, 74 F.3d 1545, 1552 (8th Cir. 1996) (noting that under RFRA, "prison officials bear the burden of demonstrating that the regulation is the least restrictive means of achieving a compelling interest"). Norris has the burden of demonstrating that the grooming policy is the least restrictive means to achieve security *as applied to Fegans*. See 42 U.S.C. § 2000cc-1(a) (providing that prisons cannot "impose a substantial burden on the religious exercise of a person residing in . . . an institution . . . *even if the burden results from a rule of general applicability*" (emphasis added)); see also Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal, 546 U.S. 418, 430–31 (2006) (determining RFRA requires individualized review); Koger v. Bryan, 523 F.3d 789, 796 (7th Cir. 2008) (noting that RLUIPA, unlike the Free Exercise Clause of the Constitution, requires individualized review); Spratt v. R.I. Dep't of Corr., 482 F.3d 33, 39, 40 n.9, 41 (1st Cir. 2007) (rejecting the prison's "all or nothing" argument and finding that the prison "must . . . establish that prison security is furthered by barring [the individual] from engaging in" the disputed conduct); Washington v. Klem, 497 F.3d 272, 285 (3d Cir. 2007) (noting that RLUIPA requires an assessment of whether the government action is the least restrictive means as applied to the individual). Norris must not only justify the policy as a whole, but he must also justify his failure to grant a religious-based exception to Fegans.

In upholding the grooming policy, the majority relies on Hamilton, a case where we upheld a prison's hair-length regulation. Ante at 6–12. In Hamilton, however, we upheld the regulation based on a record that was "fully developed as to the prison

-17-

officials' basis for denying the inmate's requests . . . ." <u>Pounders v. Kempker</u>, 79 Fed. Appx. 941, 943 (8th Cir. 2003) (unpublished) (citing <u>Hamilton</u>, 74 F.3d at 1547–48 and noting that the decision was based on a "fully developed" record detailing the prison officials' decision). In this case, the record indicates Norris never even considered granting Fegans a religious-based exception, and the record is certainly not "fully developed as to [Norris's] basis for denying [Fegans's] request[]". (T. Tr. 252). Also, in <u>Hamilton</u>, we explicitly distinguished a case where we struck down a hair-length regulation because "the only reason advanced in support of the regulation was the Warden's opinion, unsupported by empirical proof," that another alternative would be unworkable. <u>Hamilton</u>, 74 F.3d at 1555 n. 11 (distinguishing <u>Teterud v. Burns</u>, 522 F.2d 357, 361 (8th Cir. 1975)). Furthermore, contrary to the facts of this case, the inmate in <u>Hamilton</u> was in a maximum security facility when he was denied the religious-based exception, 74 F.3d at 1547, and the <u>Hamilton</u> court was not faced with claims that evidence, such as a disparity in grooming policies among males and females or a medical exception, indicates that the grooming regulation could not possibly be the least restrictive alternative, <u>see</u> <u>id.</u> at 1554–55.

Our decision in <u>Murphy v. Mo. Dep't of Corr.</u>, 372 F.3d 979, 989 (8th Cir. 2004), a case decided under RLUIPA, is instructive. We remanded <u>Murphy</u>, noting that the prison did not demonstrate that it "seriously considered any other alternatives" to a regulation alleged to infringe on prisoners' free exercise of religion. 372 F.3d at 989. The prison denied a request by members of the Christian Separatist Church Society, a religion that believes Caucasians "are uniquely blessed by God," to engage in group worship. <u>Id.</u> at 981–82. Prison officials testified that they denied the request, fearing the worship services would result in racial violence. We acknowledged in <u>Murphy</u>, and I acknowledge here, that prison officials' security concerns are valid, <u>id.</u> at 988; nevertheless, under "RLUIPA's higher standard of review, prison authorities must provide some basis for their concern that [safety problems] will result from any accommodation of [the] request." <u>Id.</u> at 989.

-18-

In justifying policies under RLUIPA, "prison authorities must do more than offer conclusory statements and post hoc rationalizations for their conduct." Hamilton, 74 F.3d at 1554 n.10 (citing S. Rep. No. 103-111, at 10 (1993), as reprinted in 1993 U.S.C.C.A.N. 1892, 1900)).  Prison officials cannot "justify restrictions on religious exercise by simply citing to the need to maintain order and security in a prison.  They . . . must demonstrate that they actually considered and rejected the efficacy of less restrictive measures before adopting the challenged practice."  Alvarez v. Hill, 518 F.3d 1152, 1156 (9th Cir. 2008) (citations and quotations omitted).

The majority does not, and can not, dispute that Norris must conduct an individualized review and that strict scrutiny applies to Norris's decision not to grant a religious-based exception to Fegans.  Instead, the majority opinion indicates that Norris did conduct an individualized review and that he determined that the grooming policy as applied to Fegans was the least restrictive means to achieve security.  Ante at 11–15.  However, the majority does not point to any evidence that prison officials considered whether to apply the policy to Fegans.  Instead, the majority points to evidence that prison officials considered alternatives when formulating the policy as a whole.  Ante at 11 n.3.  The majority opinion also does not cite to any evidence that Norris considered granting Fegans an exception.  Norris testified he was "sure [prison officials] considered other alternatives" to the grooming policy that would achieve security; however, he could not recall any of these alternatives, nor remember how long they were considered, (T. Tr. 240), although he did testify that none of the alternatives involved a religious exception, (T. Tr. 235).  Regardless of whether Norris's failure to recall was because he forgot or because he never considered other alternatives, the record does not include any examples of less restrictive alternatives Norris considered when the policy was formulated or when declining to grant Fegans an exception.  In fact, Norris explicitly testified that he would not consider granting a religious-based exception to anyone, regardless of the sincerity of their beliefs, (T. Tr. 252), and the prison warden testified he would not have considered granting one to Fegans, (T. Tr. 467).  Considering all the evidence the district court credited, there

is still no indication that prison officials seriously considered any alternatives to the grooming policy that would not substantially burden Fegans's religious exercise. Thus, as a matter of law, I do not believe the policy can be upheld under RLUIPA. See Murphy, 372 F.3d at 989 (remanding because the record did not indicate the prison "seriously considered any other alternatives, nor were any explored before the district court").

The majority opinion concludes that "prison officials were aware" of his disciplinary history "[i]n applying this policy to Fegans." Ante at 14. While an inmate's disciplinary history may lead prison officials to conclude that security can only be achieved by applying a policy without exception to that inmate, the record does not reflect that prison officials considered Fegans's disciplinary history in declining to grant him an exception. On the contrary, as indicated above, Norris testified that he would not grant anyone a religious-based exception. (T. Tr. 252). Furthermore, although Fegans had problems with discipline in the past, he was not in a maximum security facility when the grooming policy went into effect and Fegans was denied an exception. Ante at 3–4. Fegans's placement at the time indicates prison officials did not believe he warranted the heightened restrictions of a maximum security facility. Even if prison officials were aware of Fegans's disciplinary history, there is no evidence they considered it, or any other individual characteristic, in "apply[ing] this policy to Fegans."

In distinguishing the record in the instant case from the record in Warsoldier v. Woodford, 418 F.3d 989 (9th Cir. 2005), the majority mischaracterizes Warsoldier and reverses the statutorily mandated burden of proof. Ante at 10. Warsoldier does not support the majority's holding. In Warsoldier, the Ninth Circuit granted a preliminary injunction because the prisoner was likely to succeed on the merits of his claim that a gender-based grooming regulation, similar to the one in the instant case, violated RLUIPA. Id. at 1001. The court stated that the prison presented "only conclusory statements that the hair grooming policy is the least restrictive means to

ensuring prison security" in its "attempt[] to meet its burden," id. at 998, and that the data did not support the prison's conclusions, id. at 1000–01. The court rejected the prison's argument that the "court must completely defer to [the prison's] judgment." Id. at 1001. The court noted, as our court did in Murphy, 372 F.3d at 989, that the prison "cannot meet its burden to prove least restrictive means unless it demonstrates that it has actually considered and rejected the efficacy of less restrictive measures before adopting the challenged practice." Warsoldier, 418 F.3d at 999. Even though the prison attempted to justify the gender-based differences by asserting that "women inmates are 'much less likely' to commit violent crimes than male inmates and, hence, that women inmates pose a lesser security concern," the court found the policy violated RLUIPA. Id. at 1000.

However, instead of acknowledging that Warsoldier supports a conclusion that the prison policy in the instant case violates RLUIPA, the majority distinguishes Warsoldier by putting the burden on Fegans to demonstrate that males do not pose a greater security risk than females. Ante at 10. I do not believe it is necessary for Fegans to provide "data to refute Norris's expert testimony about the relative security risks in the male and female facilities," ante at 10, because under RLUIPA, Fegans does not have the burden of proof. Norris does. 42 U.S.C. § 2000cc-1(a); Hamilton, 74 F.3d at 1552 (noting that under RFRA, "prison officials bear the burden of demonstrating that the regulation is the least restrictive means of achieving a compelling interest"). While the Ninth Circuit in Warsoldier did cite data to refute the prison officials' conclusory assertions, this was data provided by the prison itself. The court gave no indication that the data was necessary or that it was the plaintiff's burden to rebut the prison officials' assertions. Warsoldier, 418 F.3d at 1000. On the contrary, the court repeatedly emphasized that under RLUIPA, the prison, and not the plaintiff, had the burden to establish that the policy was the least restrictive means. Id. at 998, 1001; see also Hamilton, 74 F.3d at 1552. Regardless of whether the prison offers "a formal statistical presentation," ante at 10–11 n.2, conclusory assertions alone cannot, as a matter of law, satisfy Norris's burden. See Hamilton, 74 F.3d at

1554 n.10 (citing S. Rep. No. 103-111, at 10 (1993), as reprinted in 1993 U.S.C.C.A.N. 1892, 1900).

Additionally, I do not believe Norris has adequately justified his failure to grant Fegans a religious-based exception in light of the fact that the policy requires of Fegans what it does not require of females and those with a certain medical condition. The majority accepts Norris's conclusory statements to justify the grooming policy's gender-based differences and medical exception: "'Women are not generally as violent as men . . . . They are not as prone to give us problems with contraband as men.'" Ante at 10 (quoting (T. Tr. 237–38)). Norris also justifies the gender-based differences in the policy by stating that the differences were implemented "to let women be as much . . . a woman as they can and still maintain good security." (T. Tr. 237). Norris's testimony is unsupported by any evidence, empirical or otherwise. His testimony indicates the policy was based on "generalizations or tendencies" about the differences between men and women, which are impermissible justifications even under intermediate scrutiny. United States v. Virginia, 518 U.S. 515, 541, 550–56 (1996) (internal quotation omitted) (holding that a gender-based policy justified on assumptions about the differences between females and males does not survive intermediate scrutiny). While the prison's gender-based policy is not subject to strict scrutiny, Norris's failure to apply the policy equally between males and females and his conclusory and unsupported justification of the policy's gender-based differences lead me to conclude the policy as applied to Fegans is not the least restrictive means to achieve safety and security.

Likewise, Norris's willingness to grant an exception to those with a dermatological condition indicates the policy is not the least restrictive alternative. The majority opinion points out that "there may be good reason to distinguish" between Fegans and those with a dermatological condition. Ante at 14 n.4. I do not dispute that there may be good reasons to provide exceptions to some and not to others. However, it is the prison's burden to establish that the policy as applied to

-22-

Fegans is the least restrictive means. Norris did not explain why this exception would not impair security but a religious-based exception would. He also did not explain why he granted this exception to "take good care of the inmates," (T. Tr. 263), but he would not consider granting a religious-based exception. The prison has failed to establish this burden, and I do not believe it can be established by post-hoc rationalizations provided by the court.

While the majority points out that the existence of a medical exception does not "win the day for Fegans," ante at 13, I believe that the medical exception, like the gender-based differences, indicates that exceptions can be made without sacrificing safety and security concerns. Norris justified his failure to accommodate Fegans by explaining that he would not allow any religious-based exceptions to the policy: "You have to treat everybody the same. . . . And if you don't . . . there wouldn't be a grooming policy." (T. Tr. 252). However, the prison's grooming policy itself does not treat Fegans the same as females and those with a certain dermatological condition, thus undercutting Norris's testimony that the policy must be uniformly applied in order to be effective. Just as prison officials considered whether security could be achieved while "let[ting] women be as much . . . a woman as they can " and while "tak[ing] good care" of those with a dermatological condition, RLUIPA requires prison officials to consider whether security could be achieved while not substantially burdening Fegans's exercise of his religion. The record indicates the prison did not consider this. It was thus improper for the district court to uphold the regulation as applied to Fegans. I would remand to give the prison the opportunity to conduct the individualized review RLUIPA requires.

_____