**NONPRECEDENTIAL DISPOSITION**
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Submitted February 17, 2010[*]
Decided March 5, 2010

**Before**

FRANK H. EASTERBROOK, *Chief Judge*

DIANE P. WOOD, *Circuit Judge*

ANN CLAIRE WILLIAMS, *Circuit Judge*

No. 08-1908

| | |
|---|---|
| JASON WILLIAMS, | Appeal from the United States District |
| *Plaintiff-Appellant,* | Court for the Southern District of Illinois. |
| | |
| *v.* | No. 02-1177-GPM |
| | |
| DONALD N. SNYDER, JR., et al., | G. Patrick Murphy, |
| *Defendants-Appellees.* | *Judge.* |

**O R D E R**

Jason Williams, an Illinois prisoner, sued officers at Menard Correctional Center under 42 U.S.C. § 1983, claiming that they had violated his federal rights by forcing him to cut his dreadlocks, which he wears in observance of his faith, Rastafarianism. *See Reed v. Faulkner*, 842 F.2d 960, 962 (7th Cir. 1988) (summarizing Rastafarian doctrine). He contends

---

[*]After examining the briefs and the record, we have concluded that oral argument is unnecessary. Thus, the appeal is submitted on the briefs and the record. *See* FED. R. APP. P. 34(a)(2).

that, by making him remove his dreadlocks, the officers retaliated against him for filing grievances and violated his free-exercise rights under the First Amendment and the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc-1. *Williams v. Snyder, et al.*, 150 Fed. Appx. 549 (7th Cir. 2005). Williams received a trial in 2008, but at the close of evidence the district court granted the defendants' motion for judgment as a matter of law, a ruling Williams challenges on appeal. *See* Fed. R. Civ. P. 50(a). We affirm.

To support his free-exercise claim, Williams detailed the discipline that he has received since 2000 when he become a Rastafarian. In April 2001, the prison first ordered him to remove his dreadlocks, and when he refused he was placed in segregation. When he defied more orders to remove his dreadlocks, he received disciplinary tickets. Prison officials later ordered him to remove his dreadlocks before attending his disciplinary hearings, but when he again refused, he was deemed to have declined to appear. When Williams requested non-emergency medical care and showers, he again disobeyed orders to remove his dreadlocks and received further discipline.

To support his retaliation claim, Williams described the timing and use of the prison's grooming policy. An officer first placed Williams in disciplinary segregation just days after Williams had filed a grievance against two other officers for calling him names. And a year later, prison officers forcibly cut his hair two days after he filed this federal lawsuit. Finally, some inmates at other Illinois prisons and Gregory Collins-Bey at Menard wore dreadlocks without trouble. Guards cut Collins-Bey's hair several days before Williams's trial, however.

Prison officers defended the no-dreadlock policy by describing the dangers of matted hair at a maximum-security facility like Menard. Dreadlocks conceal drugs, sharp plastic objects, needles, makeshift blades constructed from pens, and even kitchen knives. Guards had been injured by such contraband. In addition inmates sometimes smuggled black thread in their hair to create makeshift handcuff-saws by coating the thread with toothpaste and letting it harden and dry.

The officers considered inadequate several possible alternatives to prohibiting dreadlocks: A metal detector could not detect drugs or plastic objects; a hand-search of inmates' hair by prison guards was unsafe because hidden objects could injure the guards; and self-administered searches by the inmates themselves were ineffective because inmates easily avoided "discovering" any concealed contraband. Finally, cuffing prisoners' hands behind their backs did not always prevent them from reaching contraband in their hair because many prisoners could step their legs backwards through their arms.

The prison officers explained that the statewide policy prohibiting dreadlocks was implemented in stages from 2000 through 2002. Menard was the "pilot" facility, so inmates wearing dreadlocks at other prisons were flagged and transferred to Menard. Inmates at Menard learned of the policy in early 2001, and in April (about the time Williams filed his grievance for name-calling), officers were instructed to begin enforcing it. For that reason they began to discipline dreadlock-wearing inmates who came to their attention, including Williams, although not with perfect regularity. For example, Menard officers mistakenly believed that Collins-Bey had won a court victory exempting him from any grooming policies. Only when reviewing his record while preparing for the Williams trial did they discover that they were actually free to cut his hair, and they did so.

The district court ruled that the evidence would not permit a reasonable jury to conclude in favor of Williams, so it granted the defendants' motion for judgment as a matter of law on both claims. *See* Fed. R. Civ. P. 50(a)(1); *Greene v. Potter*, 557 F.3d 765, 768 (7th Cir. 2009). For his retaliation claim, Williams had failed to adduce evidence that prison officials issued baseless disciplinary tickets against him in retaliation for his administrative grievances. *See Lekas v. Briley*, 405 F.3d 602, 614 (7th Cir. 2005). And for his RLUIPA claim, Williams provided insufficient evidence to rebut the testimony that the grooming policy was the least restrictive means of furthering the prison's compelling interest in security. *See* 42 U.S.C. § 2000cc-1(a); *Ortiz v. Downey*, 561 F.3d 664, 670 (7th Cir. 2009) (listing elements of a RLUIPA claim).

On appeal Williams's first challenge is that the timing between the filing of his grievances and his placement in disciplinary segregation would allow a reasonable jury to find retaliation. But in the prison context, suspicious timing is not enough to overcome uncontradicted evidence of other, non-retaliatory motives—in this case, the correctional officers' unrebutted testimony that the prison disciplined Williams for disobeying orders to remove his dreadlocks under the grooming policy. *See Smith v. Campbell*, 250 F.3d 1032, 1038 (6th Cir. 2001). *See also Andonissamy v. Hewlett-Packard Co.*, 547 F.3d 841, 851 (7th Cir. 2008) (observing that, in other contexts, suspicious timing is generally not enough to support a retaliation claim). Williams counters that a jury could also rely on the evidence that he presented of inconsistent implementation. But the Constitution does not insist that prison policy be implemented with perfect regularity, only that deviations not be for illegitimate reasons. *See Russell v. Richards*, 384 F.3d 444 , 448 (7th Cir. 2004) (fit between prison's actions and objectives "need not be perfect," just rational); *Ustrak v. Fairman*, 781 F.2d 573, 575-76 (7th Cir. 1986) ("perfect consistency" in prison is unattainable). Williams identifies one Menard inmate who was temporarily free to wear dreadlocks, but he does not offer evidence to rebut the prison's explanation that this occurred only because of an innocent albeit mistaken belief that the inmate was exempt by court order from the grooming policy.

We turn next to Williams's RLUIPA claim. In assessing whether an institution has asserted a compelling governmental interest, we give "due deference" to the experience and expertise of prison administrators. *Cutter v. Wilkinson*, 544 U.S. 709, 723 (2005). The parties here focus on whether the grooming policy is the least restrictive means of furthering the prison's admittedly compelling interest in security. *See Pell v. Procunier*, 417 U.S. 817, 823 (1974); *Borzych v. Frank*, 439 F.3d 388, 391 (7th Cir. 2006). Williams asserts that dreadlocks do not make it easier to conceal contraband and that banning dreadlocks does not further the prison's interest in security. That assertion is belied by the undisputed evidence that matted hair puts guards and inmates at a significant risk of injury from concealed weapons and other contraband. Alternatively, Williams argues that even if dreadlocks are dangerous, they can be searched and need not be cut. Yet the officers' uncontradicted testimony reveals the inadequacy of search methods, so a reasonable jury could not have found that one of these methods was overlooked. *See Fegans v. Norris*, 537 F.3d 897, 903 (8th Cir. 2008) (involving testimony that hand-searches would increase risk of assault or injury); *May v. Baldwin*, 109 F.3d 557 (9th Cir. 1997) (upholding a grooming policy challenged under a similar provision of the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb-1). Williams counters that even if an underlying ban on dreadlocks is permissible, implementing that ban through multiple disciplinary sanctions violates RLUIPA because such sanctions are unduly restrictive. He argues that administrative detention and forced haircuts would suffice. But our sister circuits have not found fault with disciplining prisoners for failing to comply with an otherwise-valid grooming policy, and neither do we. *See Fegans*, 537 F.3d 897; *May*, 10 F.3d 557.

Williams also raises a raft of arguments that are readily dispatched. He contends that the district court erred by failing to grant him preliminary relief, but that issue is mooted by the decision on the merits. Williams implies that the judge was racially biased, but Williams presented no evidence of bias, racial or otherwise. He contends that the officers perjured themselves, but again the accusation is unsubstantiated. Williams also asserts that the district court mischaracterized his claims when it originally dismissed them (an order that we reversed), but this assertion, too, is baseless. Finally, Williams accuses the district court and defendants of witness-tampering. All he points to, however, is the denial of his request for an additional witness to bolster his point that the grooming policy was not enforced uniformly. He made this point adequately, and the defendants answered it.

Accordingly, we AFFIRM the judgment of the district court.